## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| JANELL BRAXTON | ) | |
| *Plaintiff* | ) | |
| v. | ) | Case No. 2:20-cv-02287 |
| | ) | |
| WALMART, INC. | ) | |
| *Defendant* | ) | |

## PLAINTIFF'S RESPONSE TO
## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

COMES NOW Plaintiff Janell Braxton, providing the following facts, arguments, and authorities to show why Defendant's *Motion for Summary Judgment* (Doc. 94), should be DENIED.

**SUBMITTED BY:**

Kenneth D. Kinney – D.Kan. #78544
Thomas F. Ralston – D.Kan. #
RALSTON KINNEY, LLC
4717 Grand Avenue, Suite 300
Kansas City, Missouri 64112
Telephone: (816) 298-0086
Fax: (816) 2978-9455
Email: ken@rklawllc.com
Email: tom@rklawllc.com

**ATTORNEYS FOR PLAINTIFF**

# **TABLE OF CONTENTS**

INTRODUCTION .........................................................................................................................1

LEGAL STANDARD...................................................................................................................2

PLAINTIFF'S RESPONSES TO WALMART'S STATEMENT OF MATERIAL FACTS ........3

PLAINTIFF'S STATEMENT OF ADDITIONAL MATERIAL FACTS ...................................25

ARGUMENT AND AUTHORITIES ........................................................................................42

CONCLUSION...........................................................................................................................59

**INTRODUCTION**

Kansas law protects the public policy established by the legislature by making it illegal to fire employees who engage in certain behaviors. It is illegal to fire an employee for suffering a workplace injury, reporting it, seeking medical treatment, or for claiming workers' compensation. Firing an employee for any of these reasons undermines the public policy of protecting workers' compensation rights. An employer who interferes with these rights by firing an employee has broken the law. That is precisely what Walmart did in this case.

Walmart fired Plaintiff approximately thirty minutes after she filled out a Statement Form describing her workplace injury – on a form that said Plaintiff would not be retaliated against. All three Walmart employees involved in the decision to fire Plaintiff agree they would not have fired her if she did not suffer a workplace injury or report it. That is precisely what the law forbids. These same three Walmart employees wholly disregarded several policies they were required to follow in response to learning an employee has become injured.

Walmart refused to offer Plaintiff medical treatment, to record her workplace injury, to report her injury to the State, to investigate the injury, to complete the required paperwork, and to provide Plaintiff documents about her rights. Instead of following the policies and laws that protect workers' compensation rights, Walmart exercised its discretionary right to issue discipline. But instead of issuing the level of discipline required by Walmart policy, they fired her. Walmart fired Plaintiff for allegedly not timely reporting her workplace injury (even though she did timely report it) despite knowing it never trained her on when to report a workplace injury, what constitutes a workplace injury, or who to report it to. Based on the evidence, a jury could find that the reason Walmart disregarded its own policies was to prevent Plaintiff from exercising her workers' compensation rights. Accordingly, Walmart's Motion should be DENIED.

## **LEGAL STANDARD**

Summary judgment is only proper where there are no disputed material facts and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). When deciding a summary judgment motion, the Court must adhere to the "fundamental principle[s]" that govern the analysis. *Tolan v. Cotton*, 134 S.Ct. 1861, 1863; 1868 (U.S. 2014). Failure to do so warrants reversal. *See id.*

To obtain summary judgment, the movant must prove all its material facts are undisputed. *Golleher v. Aeropspace Dist. Lodge*, 122 F. Supp.2d 1053, 1056 (8th Cir. 2000). When evaluating the facts, the Court "may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150 (2000). All the evidence must be viewed in favor of the non-moving party. *Tolan*, 134 S.Ct. at 1866. All "the evidence of the nonmovant [must] be believed" and every "justifiable inference" must be drawn in the nonmovant's favor. *Id.* at 1863. Conversely, inferences in movant's favor are forbidden. *See id.* at 1866-67 (discussing inferences the trial court impermissibly drew in movant's favor).

The Court should be cautious of granting summary judgment based on testimony from interested witnesses. *Reeves*, 530 U.S. at 151. Any evidence favoring Walmart that a jury *might* not believe must be disregarded, such as evidence that is contradicted, impeached, or comes solely from interested witnesses. *See id.* Ultimately, summary judgment must be denied when the evidence and inferences drawn therefrom *could* allow a reasonable jury to return a verdict for the plaintiff. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Under this framework, Walmart is not entitled to summary judgment. The material facts Walmart relies on are disputed, and Plaintiff's additional facts show a countervailing story, upon which a jury could find Walmart broke the law as alleged by Plaintiff.

2

## PLAINTIFF'S RESPONSES TO WALMART'S STATEMENT OF MATERIAL FACTS

### A.      Walmart Employs Braxton as a Seasonal Associate

1.      Walmart hired Braxton in March 2020, to work at its facility in Edgerton, Kansas. (Ex. A, Deposition of Janell Braxton at 11:16-18, 12:9-11).

**RESPONSE: UNCONTROVERTED.**

2.      The Edgerton facility is associated with Jet.com, a company Walmart owns. *(Id.* at 12:1-8; Ex. B, Deposition of Quincy Usry at 126:5-7).

**RESPONSE: UNCONTROVERTED.**

3.      Braxton's first day of work was March 23, 2020.  (Ex. A, Braxton Depo. at 26:3-6).

**RESPONSE: UNCONTROVERTED.**

4.      She worked as a QC Singles Associate. *(Id.* at 26:7-10).

**RESPONSE: UNCONTROVERTED.**

a.  **Plaintiff's job title was "Associate, Warehouse Fulfillment."** *See Exhibit 1***, Job Description, WM_Braxton_000132-33, Depo. Ex.21;** *See also Exhibit 2***, Deposition of Janelle Braxton, 28:3-11; 29:20-24.**

5.      Braxton worked in a warehouse and helped to ship customer orders. Her job involved taking products to her work station, scanning the products  on a computer system, packaging those products and placing them on a conveyor belt. *(Id.* at 26:17-22; 31:25-32:4).

**RESPONSE: UNCONTROVERTED.**

6.      Braxton was a seasonal associate. *(Id.* at 26:23-25).

**RESPONSE: UNCONTROVERTED.**

7.      Braxton was hired as a seasonal associate on a temporary basis due to a surge of customer demand.  As a seasonal associate, Braxton had no guarantee of regular employment. *(Id.* at 27:6-20).

**RESPONSE: CONTROVERTED IN PART, and IMMATERIAL.**

    **a.** **Plaintiff was initially hired because Defendant's business (online shopping) was growing due to coronavirus. Although Plaintiff was not guaranteed permanent employment, she was told if she performed well, then "more than likely you would be able to stay and become permanent."** *Exhibit 2*, **27:16-20.**

    **b.** **Plaintiff intended on working until she became a permanent employee.** *Exhibit 2*, **27:25 – 28:2.**

    **c.** **It is IMMATERIAL that Plaintiff's employment was at-will,** *i.e.,* **not guaranteed for a fixed duration.**

    **The doctrine of retaliatory discharge is an exception to the at-will employment doctrine.** *See Murphy v. City of Topeka-Shawnee County Dept. of Labor Servs.,* **630 P.2d 186, 189 (Kan.App. 1981). The doctrine makes it illegal for an employer to fire an employee for suffering a workplace injury that might lead to a workers' compensation claim in the future.** *See Pilcher v. Bd. of Cnty. Comm'rs of Wyandotte Cnty.,* **787 P.2d 1204, 1211 (Kan.App.1990). Therefore, Plaintiff's status as an at-will employee is not a defense to a claim of retaliatory discharge.**

    8.    Braxton worked an overnight shift that began at 6:30 p.m. and ended at 5:00 a.m. *(Id.* at 32:18-22).

**RESPONSE: UNCONTROVERTED.**

    9.    Walmart maintained a safety cubicle in the middle of the Edgerton facility, which associates could go to if they required first aid or needed safety-related assistance.*(Id.* at 34:11-25).

**RESPONSE: UNCONTROVERTED.**

    10.    Braxton knew that she was supposed to visit the safety cubicle if she required medical attention. *(Id.* at 36:18-21).

**RESPONSE: UNCONTROVERTED.**

    11.    She also knew that she could go to the safety cubicle on her own, even if her manager had not instructed her to do so. *(Id.* at 36:22-25).

**RESPONSE: UNCONTROVERTED.**

### B.     <u>Braxton Suffers a Wrist Injury on April 13</u>

12.     Braxton worked three consecutive shifts, on April 12 through April 15, 2020. *(Id.* at 39:4-12).

**RESPONSE: UNCONTROVERTED.**

13.     On April 12, 2020, (a Sunday) she arrived for her shift at around 6:10 p.m. or 6:20 p.m. *(Id.* at 46:8-11).

**RESPONSE: UNCONTROVERTED.**

    a. **Braxton clocked into work at 6:26 PM on April 13, 2020.** *Exhibit 3*, **Employee Activity, WM_Braxton_000106; Depo.Ex.27.**

14.     Braxton started to work. Then, at about 1:00 a.m. on the morning of April 13, 2020, Braxton felt throbbing pain in her left wrist. *(Id.* at 48:12-23).

**RESPONSE: UNCONTROVERTED.**

    a. **Notably, Walmart previously denied this fact.** *See Exhibit 9, Defendant's Response to Plaintiff's First Requests for Admission*, **¶9 (denying "At approximately 1:00 AM on April 13, 2020, Janell Braxton began experiencing pain in her left wrist."). This inconsistency should be considered when assessing whether Walmart is credible.**

15.     The throbbing pain got progressively worse as Braxton continued to work. *(Id.* at 51:1-5).

**RESPONSE: UNCONTROVERTED.**

16.     According to Braxton, at about 5:00 a.m., which was the end of her shift, Braxton's manager, Ammie Wilbur ("Wilbur"), came over to Braxton to praise her for doing a good job during the shift. Braxton claims that she told Wilbur her wrist was hurting. *(Id.* at 51:17-23).

**RESPONSE: CONTROVERTED due to Walmart's mischaracterization of the testimony cited.**

    a. **On April 13, 2020, Plaintiff told her Manager, Ammie Wilbur that her wrist was really hurting her.** *Exhibit 2*, **51:21-23.**

    b. **Plaintiff's testimony is not a "claim" – it must be accepted as true for purposes of**

summary judgment. *Tolan v. Cotton*, 134 S.Ct. 1861, 1863 (U.S. 2014) ("The evidence of the nonmovant is to be believed…").

17.      Braxton says she did not elaborate on why her wrist was hurting, did not say that she had injured her wrist earlier in the shift, and did not ask to visit the safety cubicle.*(Id.* at 53:1-7).

**RESPONSE: UNCONTROVERTED IN PART.**

   a.  **Walmart's suggestions that Braxton "did not say that she had injured her wrist earlier in the shift" is not supported by the cited testimony. *Exhibit 2*, 53:1-7. Walmart might believe that is a reasonable inference from the testimony - but drawing inferences in favor of Walmart is forbidden. *See Tolan v. Cotton*, 572 U.S. 650, 660 (2014).**

18.      Braxton likewise had not visited the safety cubicle during the four hour period between when her wrist started hurting at 1:00 a.m. on April 13, and when she allegedly spoke to Wilbur at 5:00 a.m.  *(Id.* at 53:12-16).

**RESPONSE: UNCONTROVERTED.**

19.      Wilbur denies that Braxton reported the wrist pain to her at the end of the April 12-13 shift.  (Ex. C, Wilbur Dep. at 16:4-7; 18:15-17).

**RESPONSE: Wilbur's denial is CONTROVERTED. Whether Plaintiff reported her wrist pain to Wilbur on April 13, 2020 is a genuinely disputed material fact.**

   a.  **On April 13, 2020, Plaintiff told Ammie Wilbur her wrist was hurting. *Exhibit 2*, 51:12-23; 53:1-4.**

   b.  **The Court should not rely on self-serving testimony from an interested witnesses in ruling on summary judgment. *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 151 (2000). Wilbur has a self-serving motive to deny the fact of Braxton's initial report of injury to her.**

      i.  **According to Walmart, Plaintiff was fired for not reporting a workplace injury to management during the same shift in which it occurred. *Exhibit 4*, Deposition of Walmart (Usry – 04/30/2021), 37:6-9; 39:1-10; 39:15-18; *see also Exhibit 5*, WMV-763e, Depo.Ex.25.**

      ii.  **According to Walmart, Ammie Wilbur had a duty under Walmart policy to**

6

**report known workplace injuries, even if the injury happened to someone else, and if Wilbur did not report a known injury during the same shift learned of it, Wilbur would be subject to discipline.** *Exhibit 4*, **Deposition of Walmart (Usry – 04/30/2021), 40:7-16; 40:23 – 41:1; 41:7-10; 52:5-8; 52:16-24.**

20.     Braxton finished working and went to her boyfriend's home after her shift ended. (Ex. A, Braxton Depo. at 56:12-20).

**RESPONSE: UNCONTROVERTED.**

21.     She reported for her next shift, which began on the evening of Monday, April 13 and ended on April 14. *(Id.* at 57:14-18).

**RESPONSE: UNCONTROVERTED.**

22.     Her wrist was still hurting at this point. *(Id.* at 58:21-24).

**RESPONSE: UNCONTROVERTED.**

23.     At the beginning of this shift, Braxton claims that she told a manager that her wrist was hurting. *(Id.* at 61:17-20).

**RESPONSE: CONTROVERTED due to Walmart's mischaracterization of the testimony.**

   a.   **At the beginning of her evening shift on April 13, 2020, Plaintiff told the Manager on duty (which was either Ammie Wilbur or another female employee) that her wrist was still hurting.** *Exhibit 2*, **59:13-20; 61:5-24).**

   b.   **Plaintiff's testimony is not a "claim" – it must be accepted as true for purposes of summary judgment.** *Tolan v. Cotton*, **134 S.Ct. 1861, 1863 (U.S. 2014) ("The evidence of the nonmovant is to be believed…").**

24.     Braxton did not visit the safety cubicle during the April 13-14 shift. *(Id.* at 64:22-65:2).

**RESPONSE: UNCONTROVERTED.**

25.     Braxton completed this shift, and then went to her boyfriend's house. *(Id.* at 66:20-67:1).

**RESPONSE: UNCONTROVERTED.**

### C.   Walmart Terminates Braxton's Employment

26.   Braxton next reported to work for her April 14-15, 2020 shift. *(Id.* at 68:20- 22).

**RESPONSE: UNCONTROVERTED.**

27.   About two or two and a half hours into her shift, Braxton approached Wilbur to talk about her wrist pain.  *(Id.* at 72:11-73:7).

**RESPONSE: UNCONTROVERTED.**

28.   Braxton asked if she could get a brace or a wrap to help with the pain.  *(Id.* at 75:5-14).

**RESPONSE: UNCONTROVERTED.**

29.   Wilbur told Braxton to go to the safety cubicle. *(Id.* at 73:8-10).

**RESPONSE: UNCONTROVERTED.**

30.   Braxton went to the safety cubicle and spoke with the safety associate stationed there. *(Id.* at 77:1-4).

**RESPONSE: UNCONTROVERTED.**

31.   She asked the safety associate whether he had a wrap or brace for her wrist. *(Id.* at 77:21-24).

**RESPONSE: UNCONTROVERTED.**

32.   The safety associate told Braxton that he did not have a wrap or brace, and instead gave her ointment to put on her wrist. *(Id.* at 78:2-11).

**RESPONSE: UNCONTROVERTED.**

33.   Braxton returned to her station at 9:10 p.m. *(Id.* at 81:9-16).

**RESPONSE: UNCONTROVERTED.**

34.   At about 10:34 p.m., Braxton had another conversation with Wilbur, in which

Wilbur asked Braxton whether she thought her wrist pain was due to something that happened at work. Braxton said yes. *(Id.* at 83:24-84:13).

**RESPONSE: UNCONTROVERTED.**

35.     After this conversation, Wilbur reported what Braxton had told her to David Whitenack ("Whitenack"), an Operations Manager whose job duties involved supervising other managers and overseeing the Edgerton facility. (Ex. D, Deposition of David Whitenack at 8:22, 9:15-19, 79:2-7).

**RESPONSE: UNCONTROVERTED.**

36.     Then, Whitenack, whom Braxton did not know, came to her work station, and asked her how she had hurt her wrist. (Ex. A, Braxton Dep. at 86:1-16; 87:2-9). Braxton responded that she had been doing her job duties, and realized her wrist was hurting.  *(Id.* at 87:7-9).

**RESPONSE: UNCONTROVERTED.**

37.     Braxton logged off from her work station at 10:54 p.m., and Whitenack escorted Braxton to the safety cubicle.  *(Id.* at 88:8-10; 89:18-21).

**RESPONSE: UNCONTROVERTED.**

38.     At the safety cubicle, Whitenack asked Braxton to fill out a statement to record "everything [she] was feeling, that was going on with [her] wrist." *(Id.* at 90:19- 91:1).

**RESPONSE: CONTROVERTED in part.**

> a.  **In addition to handing her a blank form to fill out, Whitenack also asked Plaintiff to fill out an "incident report."** *Exhibit 2***, 90:21-23; 91:2-5.**

39.     Whitenack told Braxton to write down when she suffered her injury and when and to whom she reported it. (Ex. D, Whitenack Dep. at 79:24-80:3).

**RESPONSE: CONTROVERTED. There is no evidence that Whitenack gave these specific instructions to Plaintiff when he handed her the blank statement form.**

> a.  **Whitenack did <u>not</u> ask Plaintiff whether she had told anyone else about her workplace**

injury. *Exhibit 2*, 87:18-21.

b. **According to Plaintiff, when Whitenack asked Plaintiff to write on the blank Statement Form, he told her "to write down everything that [she] was feeling, that was going on with [her] wrist." *Exhibit 2*, 90:21 – 91:1; *see also* SOF ¶38.**

c. **The first time Whitenack testified on this subject matter, he said, "I asked her to write down what date and time she recalled experiencing the pain." *Exhibit 6,* Whitenack Depo., 49:16-20. He did not say he asked Plaintiff to write down who she first reported it to or when she first reported it.**

d. **The Statement Form Plaintiff filled out includes the information that she claims she was asked to include (everything she was feeling) and the information Whitenack initially said he asked Plaintiff to include (what date and time the pain started). *See Exhibit 14*, Statement Form 4-14-2020 (Depo.Ex.40). Notably, the Statement Form does not say anything about when Plaintiff first reported it, to whom she first reported it. *Id.***

**Therefore, it is reasonable to infer that Plaintiff's testimony and Whitenack' s initial testimony is accurate – Whitenack did <u>not</u> ask Plaintiff to record on the Statement Form when and to whom she previously reported the injury.**

e. **Even on cross-examination, in response to a question from Walmart's attorney, Walmart's Operations Manager Whitenack did <u>not</u> testify that he gave Plaintiff these specific instructions. Instead, Whitenack said his general practice was to ask that question. *See Exhibit 6*, 75:4-5; 80:1-3.**

**Whitenack's testimony about his general practice is controverted by Plaintiff's testimony, Whitenack's testimony about his specific conversation with Plaintiff, and by the contents of the Statement Form filled out by Plaintiff.**

40.      In her statement, Braxton wrote as follows:

On Monday morning [i.e., April 13] I noticed that my wrist began to ache. It progressed to throbbing pain and by the time I left at 5:00 am it was excruciating. I took a 500mg Tylenol & went to sleep. It is swollen & sometimes feels warm to the touch. There is a little bruising. It is hard for me to work fast when putting items in the mailers & it hurts to pick up semi heavy items with that wrist. I can only pick up the totes if they are partially full. It is my left wrist that is injured. I am trying not to use it. The pain progresses throughout the shift.

(Ex. G, Braxton Dep. Exhibit 28); (Ex. A, Braxton Dep. at 92:10-21) (authenticating this exhibit).

**RESPONSE: UNCONTROVERTED.**

41.     In her statement, Braxton did not mention reporting the wrist injury to Wilbur the same shift it occurred. (See, generally, id.).

**RESPONSE: UNCONTROVERTED.**

42.     Braxton handed the statement to Whitenack, who thanked her and told her he would be back soon. He then walked away from the safety cubicle. (Ex. A, Braxton Dep. at 103:9-12; 104:1-6).

**RESPONSE: UNCONTROVERTED.**

43.     Whitenack understood Braxton's statement to mean that she had failed to report a workplace injury during the same shift in which it occurred. (Ex. D, Whitenack Dep. at 14:12-14).

**RESPONSE: CONTROVERTED.** *See* **SOF ¶39(a-f).**

    **a.** **Whitenack did not ask Plaintiff whether she had previously reported her workplace injury.** *Exhibit 2***, 87:18-21.**

    **b.** **Whitenack's alleged understanding is based on the Statement Form given to him by Plaintiff.** *Exhibit 6***, 14:12-14. His alleged understanding has no factual basis and is therefore not credible.**

    **c.** **Plaintiff's Statement Form does not say anything about when Plaintiff first reported her injury, to whom she first reported the injury, or whether she previously reported her workplace injury.** *Exhibit 6***, 49:12-15;** *Exhibit 14***, Statement Form. It is reasonable to infer the Statement Form does not say these things because Whitenack did <u>not</u> ask Plaintiff to include them in her statement.** *See* **SOF ¶39(a-f).**

    **d.** **The Statement Form did not ask Plaintiff to write down who she first reported the pain to, so she did not write down to whom she first reported.** *Exhibit 6***, 50:10-17.**

    **e.** **Whitenack "asked [Plaintiff] to write down what date and time she recalled experiencing the pain."** *Exhibit 6***, 49:19-20.**

    **f.** **When Whitenack gave Plaintiff the blank form, "he told [Plaintiff] to write down everything [she] was feeling, that was going on with [her] wrist."** *Exhibit 2***, 90:19 – 91:1. Whitenack did not ask Plaintiff to write down who she first reported the injury to.**

    **g.** **Walmart has a separate form, called an "Incident Report," that according to Walmart company policy, is required to be given to an injured worker after Walmart learns of an injury.** *See Exhibit 4***, Deposition of Walmart (Usry – 4/30/21), 89:22-90:8;**

*Exhibit 15*, Incident Report (Depo. Ex. 40).

h. According to Walmart, it **did not** ask Plaintiff to fill out an Incident Report even though doing that was mandatory under company policy. *Exhibit 4*, 90:12-24.

i. According to Plaintiff, Walmart **did** ask her to fill out an "incident report." *Exhibit 2*, 86:4-8; 90:19-23; 91:2-5.

j. The Incident Report form asks for specific information, including when and to whom the injury was first reported. *Exhibit 4*, Deposition of Walmart, 91:19-92:6; *Exhibit 15*.

44.      Whitenack shared Braxton's statement with Quincy Usry, the Environmental Health and Safety Operations Manager ("Usry") and Morgan Medaris, a Human Resources Coordinator ("Medaris"). *(Id.* at 15:10-18; Ex. B, Usry Dep. at 7:7-8).

**RESPONSE: UNCONTROVERTED.**

45.      Walmart has a company policy, Policy 670e, that requires associates to report "any known injury before the end of the shift" in which the injury was suffered. Failure to do so results in a First Written formal disciplinary action. (Ex. H, Braxton Dep. Exhibit 24).

**RESPONSE: CONTROVERTED. These assertions are not supported by the citation, and are controverted by other evidence.**

a. The document called 670e is not a "policy" but rather it is a "Safety and Compliance Rule Violation Form" that is a template that is supposed to be used to issue safety violations to employees. *Exhibit 4*, Walmart Deposition (Usry) 46:11-21, 50:5-8; *Exhibit 6,* Whitenack Deposition, 21:18-22:14; *Exhibit 7*, Form WMW-670e, Depo.Ex.11 (same as Dep.Ex.24).

b. The Form 670e does not state that failure to report any known injury before the end of the shift "results in a First Written formal disciplinary action." *See Exhibit 7*, Form WMW-670e.

c. The phrase "First Written" does not appear on Form 670e. *Exhibit 7*.

d. The phrase "formal disciplinary action" does not appear on Form 670e. *Exhibit 7*.

e. According to Chelsea Davidson, Walmart's Senior Manager of Human Resources for the Edgerton Fulfillment Center, who is the highest-ranking Human Resources employee at Walmart's facility in Edgerton, Kansas, that facility **does not even use**

Form 670e. *Exhibit 8*, 8:16 - 9:3; 43:3-23; 44:14-17; 44:21-23.

f. **According to Chelsea Davidson, Walmart's Edgerton Fulfillment Center has <u>never</u> used Form 670e. *Exhibit 8*, 45:6-9, 19-23.**

g. **Form 670e does not state an employee can be fired for failing to report a known injury by the end of the shift. *Exhibit 4*, 49:20-23; *Exhibit 7*.**

46.     Walmart also maintained a second policy, Policy 763e, which stated inpertinent part: "All known injuries, no matter how slight, will be reported to a member of management immediately. At a minimum, these must be reported to a member of management by the end of the shift." (Ex. I at 1, Braxton Dep. Exhibit 25).

**RESPONSE: UNCONTROVERTED that Walmart maintained a written policy called WMW-763e that contained that language.**

a. **Under Walmart's policies, an injury and soreness are not considered the same thing. *Exhibit 4*, Deposition of Walmart, 66:7-10.**

b. **Policy 763e does not define "injuries." *Exhibit 4*, Deposition of Walmart, 39:23-40:2; *Exhibit 5*, Policy 763e (Depo.Ex.25).**

c. **Regular soreness from doing your job does not count as an injury incident under Walmart company policy. *Exhibit 4*, 77:10-78:1.**

d. **Walmart recognizes that an injury might not be apparent when soreness first appears. *Exhibit 4*, 79:4-6.**

e. **Policy 763e does not require an employee to report soreness. *Exhibit 4*, 44:19-24.**

47.     These policies exist so that Walmart can investigate the cause of an associate's injury, and make sure that whatever caused the injury does not harm other associates. (Ex. D, Whitenack Dep. at 103:6-10).

**RESPONSE: CONTROVERTED. The testimony cited by Walmart for this proposition comes from a witness who admitted he lacked personal knowledge of this subject matter.**

a. **David Whitenack testified that he has no personal knowledge as to why Walmart created the rules at issue in this case. *Exhibit 6*, 102:8-21.**

b. **When asked whether he could explain why Walmart has these rules, Whitenack said, "I could only speculate as to why." *Exhibit 6*, 102:19-21.**

    **c. This assertion is also controverted by Whitenack's actions – he did not investigate the cause of Plaintiff's injury when he found out about it.** *Exhibit 6*, **103:11-13.**

    48. Braxton had an opportunity to review both of these policies at the outset of her employment, and on March 20, 2020, at 11:07:30 p.m., she electronically acknowledged that she had read each policy, and agreed to abide by them. (Ex. Q, WM_Braxton_000176); (Ex. E, Medaris Dep. at 84:9-22) (authenticating Braxton's electronic acknowledgment).

**RESPONSE: CONTROVERTED.**

    **a. Form 670e is not a policy.** *See* **SOF ¶45(a-f).**

    **b. Plaintiff's employment did not start until March 23, 2020.** *Exhibit 9, Defendant's Answers to Plaintiff's First Set of Requests for Admissions*, **¶1.**

    **c. On March 20, 2020, Plaintiff acknowledged policies on her cell phone because she was instructed to review the policies before she showed up for her first day of work, but the documents did not populate or open on her phone so she was not able to review them.** *Exhibit 2*, **18:14-22; 19:13 – 20:10; 28:20-25.**

    **d. Walmart's Policy 763e (Deposition Exhibit 25) does not inform employees that they can be fired for not reporting a workplace injury by the end of the shift.** *Exhibit 4*, **41:16-19; 42:1-5;** *Exhibit 5* **(Policy 763e, Depo.Ex.25).**

    **e. Walmart's Policy 763e does not inform employees that they can be disciplined in any way for not reporting a workplace injury by the end of the shift.** *Exhibit 4*, **41:20-24.**

    **f. Walmart's Policy 763e does not inform employees that they can be fired for failing to report routine soreness during a shift in which the soreness first becomes apparent.** *Exhibit 4*, **46:2-6.**

    **g. Walmart's Form 670e does not inform employees that they can be fired for failing to report a known injury before the end of a shift.** *Exhibit 4*, **49:20-23;** *Exhibit 7* **(Form 670e, Depo.Ex.11).**

    49. Walmart also maintained a written Conduct Disciplinary Action Guidelines, which stated in relevant part that "Jet Seasonal [associates] should be terminated when their coaching has progressed to a formal written." (Ex. R, WM_Braxton_000102); (Ex. E, Medaris Dep. at 78:25-79:18) (authenticating the Conduct Disciplinary Action Guidelines, and discussing how they

mandated Braxton's termination).

**RESPONSE: CONTROVERTED.**

      a.  **The "JetFlex Disciplinary Guidelines" that were in place when Plaintiff was employed and applied to her employment with Walmart required that "A minimum of two Quick Coach conversations should occur before releasing a JetFlex associate for performance or conduct."** *Exhibit 6***, Whitenack Deposition, 40:15-25; 41:20 – 42:7;** *Exhibit 10***, JetFlex Disciplinary Guidelines, Depo. Ex. 37.**

      b.  **Plaintiff never received a Quick Coach during her employment.** *Exhibit 6***, 42:8-12.**

      c.  **During Plaintiff's employment, Walmart maintained a Policy regarding the company's response to workplace injuries that applied to all employees.** *Exhibit 4***, Walmart Deposition (Usry), 68:7-69:4, 69:16-25;** *Exhibit 11, Dot Com Safety Policy* **(Depo.Ex.51).**

      d.  **According to the Dot Com Policy that specifically applied to workplace injuries, whether to discipline employees who fail to immediately report a injury to management is a discretionary rule – issuing discipline is not mandatory.** *Exhibit 4, Walmart Deposition***, 112:9 – 114:18;** *Exhibit 11***.**

      e.  **If management exercises its discretion to issue discipline for an employee not timely reporting an injury incident, Walmart's mandatory Dot Com Safety Policy requires that the Form 670e be used to determine the appropriate level of discipline.** *Exhibit 4***, 115:13 – 117:5;** *Exhibit 11* **(Depo.Ex.51);** *Exhibit 7* **(Depo.Ex.11).**

      f.  **A Form 670e was never completed for Plaintiff.** *Exhibit 4***, 117:6-8.**

    50.    Whitenack therefore texted Usry, who was not working at the time, and informed him that Braxton "said she hurt her wrist Sunday (doesn't know how) and didn't tell anyone." (Ex. J, Exhibit 7 to Whitenack Deposition).

**RESPONSE: UNCONTROVERTED that Whitenack sent that text message to Usry.**

    51.    Whitenack asked Usry "How long do they have to report? EOS [End of shift]?" *(Id.)*.

**RESPONSE: UNCONTROVERTED that Whitenack sent that in a text message.**

    52.    Usry texted back to ask for a copy of Braxton's statement, which Whitenack sent him and further sent a copy of the reporting language from 670e. *(Id.* at 2).

**RESPONSE: UNCONTROVERTED that Usry sent the texts appearing in Defendant's Exhibit J (Doc.95-11).**

    a.  **CONTROVERTED that Usry "sent a copy of the reporting language from 670e" to Whitenack because no document has been produced showing that happened. Usry's text message says, "Awesome. Slacked you the line." *See* Defendant's Exhibit J (Doc.95-11), p.2. "Slack" is a messaging software used by Walmart for inter-office communications. But Walmart failed to produce any Slack messages in this case.**

53.    Whitenack asked, "Would she be termed with a written coaching?" *(Id.).*

**RESPONSE: CONTROVERTED. That text was sent by Usry.**

54.    Nowhere in these texts did Whitenack indicate a belief that Braxton had reported her wrist injury on the shift it happened. *(See, generally, id.).*

**RESPONSE: UNCONTROVERTED but IMMATERIAL. It is unlawful for an employer in Kansas to fire an employee for suffering a workplace injury that might lead to a workers' compensation claim. *See Pilcher v. Bd. of Cnty. Comm'rs of Wyandotte Cnty.*, 787 P.2d 1204, 1211 (Kan.App.1990).**

55.    About 15 minutes later, Whitenack returned to the safety cubicle, and took Braxton to the human resources office. (Ex. A, Braxton Dep. at 104:24-105:6).

**RESPONSE: UNCONTROVERTED.**

56.    In the human resources office, Braxton met with Whitenack and Medaris. (Id. at 105:7-9; Ex. E, Deposition of Morgan Medaris at 6:15-17).

**RESPONSE: UNCONTROVERTED.**

57.    Whitenack reminded Braxton about Walmart's policies, telling her that she should have reported her wrist injury shortly after it happened, and since she was a seasonal associate Walmart policy required that she be terminated for this infraction. (Ex.A, Braxton Dep. at 105:7-20).

**RESPONSE: UNCONTROVERTED that Walmart fired Plaintiff in close proximity to learning she was an injured worker who reported a workplace injury to Walmart.**

**The rest is CONTROVERTED.**

a. **CONTROVERTED that Whitenack "reminded" Plaintiff about anything – Plaintiff did not testify to that.** *See Exhibit 2*, 105:1-106:8.

    i. **Whitenack told Plaintiff she should have reported her work injury "within 24 hours of having it."** *Exhibit 2*, 105:13-15.

    ii. **The first time Walmart told Plaintiff she was required to report a workplace injury within 24 hours was when she was being fired.** *Exhibit 2*, 109:7-13.

b. **Whitenack told Plaintiff they were firing her "to protect themselves."** *Exhibit 2*, 105:18-20.

c. **Whitenack did not say Walmart's policy "required" Plaintiff to be fired.** *Exhibit 2*, 105:7-20.

d. **Walmart's policy did not "require" Plaintiff to be fired.**

    i. **During Plaintiff's employment, Walmart maintained a Policy regarding the company's response to workplace injuries that applied to all employees.** *Exhibit 4*, **Walmart Deposition (Usry), 68:7-69:4, 69:16-25;** *Exhibit 11, Dot Com Safety Policy* **(Depo.Ex.51).**

    ii. **According to the Dot Com Policy that specifically applied to workplace injuries, whether to discipline employees who fails to immediately report an injury to management is <u>discretionary</u> – issuing discipline is <u>not</u> mandatory.** *Exhibit 4, Walmart Deposition*, **112:9 – 114:18;** *Exhibit 11*.

    iii. **If management exercises its discretion to issue discipline for an employee not timely reporting an injury incident, Walmart's mandatory Dot Com Safety Policy requires that the Form 670e be used to determine the appropriate level of discipline.** *Exhibit 4*, **115:13 – 117:5;** *Exhibit 11* **(Depo.Ex.51);** *Exhibit 7* **(Depo.Ex.11).**

    iv. **A Form 670e was never completed for Plaintiff.** *Exhibit 4*, **117:6-8. If a Form 670e would have been filled out as required by Walmart policy, Plaintiff would have received a "<u>Step 1</u>" Rule Violation and would have only been subject to termination if she repeated the same conduct within 180 calendar days.** *See Exhibit 7*, **Form 670e.**

58.    Braxton did not tell Whitenack or Medaris that she had reported her wrist injury to Wilbur at the end of her April 12-13 shift. *(Id.* at 108:22-109:1).

**RESPONSE: UNCONTROVERTED. Plaintiff was "completely confused" because she did not do anything wrong and once she realized she was being fired she became "real**

emotional." *Exhibit 2*, 105:21-25.

59.     Whitenack, Medaris and Usry made the decision to terminate Braxton, based on

their belief that she had failed to comply with Policy 670e, and her status as a seasonal associate.

(Ex. D, Whitenack Dep. at 20:3-6; 90:16-18; 97:13-14); (Ex. E, Medaris Dep. at 21:14-16; 23:5-

9); (Ex. K, Declaration of Quincy Usry in Opposition to Pl's SJ at ¶¶ 6- 10).

**RESPONSE: CONTROVERTED.**

    **a.  Operations Manager David Whitenack terminated Plaintiff because she was an injured worker who reported a workplace injury.**

        **i.   Whitenack admitted that if Plaintiff would have never told him that she was hurt at work, he would not have had a reason to fire her. *Exhibit 6*, Whitenack Depo. 74:21 – 75:1.**

        **ii.  Whitenack agreed that "if Ms. Braxton would have never reported her workplace injury to Walmart, there would have been no reason to fire her on April 14th, 2020." *Exhibit 6*, 91:7-12.**

    **b.  Safety Manager Quincy Usry terminated Plaintiff because she was an injured worker who reported a workplace injury.**

        **i.   Usry admitted that Plaintiff would not have been fired on April 14, 2020 if she would not have reported her workplace injury. *Exhibit 12*, Usry Depo. 55:18-16:2.**

    **c.  Human Resources Business Partner Morgan Medaris terminated Plaintiff because she was an injured worker who reported a workplace injury.**

        **i.   Medaris admitted that without knowledge of Plaintiff's injury report, Walmart would not have fired Plaintiff. *Exhibit 13*, Medaris Depo. 20:9-15.**

60.     At the time Walmart terminated Braxton's employment, Whitenack did not know

that Braxton allegedly reported her wrist injury to Wilbur at the end of the April 12- 13 shift. (Ex.

D, Whitenack Dep. at 77:17-20; 78:7-9).

**RESPONSE: CONTROVERTED and IMMATERIAL.**

    **a.  IMMATERIAL because it is unlawful to fire an employee for suffering a workplace injury that might lead to a workers' compensation claim in the future. *See Pilcher v. Bd. of Cnty. Comm'rs of Wyandotte Cnty.*, 787 P.2d 1204, 1211 (Kan.App.1990).**

    **b. Whitenack knew Plaintiff was suffered a workplace injury approximately 30 minutes before he fired her.** *Exhibit 6*, **14:16-23; 15:25-16:4.**

    **c. Whitenack never asked Plaintiff whether she reported the workplace injury to anyone else.** *Exhibit 2*, **87:18-21; 111:18-23.**

    **d. Whitenack did ask Plaintiff to fill out an Incident Report.** *Exhibit 2*, **90:21-23; 91:2-5.**

    **e. The Incident Report asks when the injury when and to whom the injury was first reported.** *Exhibit 15*.

61.    At the time Walmart terminated Braxton's employment, Medaris did not know that Braxton allegedly reported her wrist injury to Wilbur at the end of the April 12-13 shift. (Ex. L, Declaration of Morgan Medaris in Opposition to Pl's SJ at ,¶¶ 5-6).

**RESPONSE: CONTROVERTED and IMMATERIAL.** *See* **SOF ¶60(a-e).**

62.    At the time Walmart terminated Braxton's employment, Usry did not know that Braxton allegedly reported her wrist injury to Wilbur at the end of the April 12-13 shift. (Ex. K, Declaration of Quincy Usry in Opposition to Pl's SJ at , ¶¶ 5-7).

**RESPONSE: CONTROVERTED and IMMATERIAL.** *See* **SOF ¶60(a-e).**

63.    Whitenack testified at deposition that Walmart made the decision to fire Braxton because she violated Policy 670e, and that he was not trying to prevent her from exercising her rights under the workers' compensation system. (Ex. D, Whitenack Dep. at 20:3-6; 90:16-18).

**RESPONSE: Both assertions are CONTROVERTED.**

    **a. First, Walmart terminated Plaintiff because she was an injured worker who reported a workplace injury.**

      **i. Operations Manager David Whitenack admitted that if Plaintiff would have never told him she was hurt at work, he would not have had a reason to fire her.** *Exhibit 6*, **Whitenack Depo. 74:21 – 75:1.**

      **ii. Whitenack agreed that "if Ms. Braxton would have never reported her workplace injury to Walmart, there would have been no reason to fire her on April 14th, 2020."** *Exhibit 6*, **91:7-12.**

iii.   Safety Manager Quincy Usry admitted that Plaintiff would not have been fired on April 14, 2020 if she would not have reported her workplace injury. *Exhibit 12*, Usry Depo. 55:18-16:2.

iv.   Human Resources Business Partner Morgan Medaris admitted that without knowledge of Plaintiff's injury report, Walmart would not have fired Plaintiff. *Exhibit 13*, Medaris Depo. 20:9-15.

b.   **Second, Walmart <u>did</u> engage in behaviors to prevent Plaintiff from exercising her rights under the workers' compensation system.**

i.   After learning of Plaintiff's workplace injury, Whitenack failed to inform Plaintiff about her right to seek medical treatment at Walmart's expense. *Exhibit 6*, 57:16-20; 58:1-5.

ii.   Whitenack said he did not offer Plaintiff the right to seek medical treatment based on her Statement Form. *Exhibit 6*, 58:21 – 59:2.

iii.   However, Plaintiff's Statement Form said she had excruciating pain, swelling, and bruising, and that she was only able to partially do her job. *Exhibit 6*, 59:7-24.

iv.   Whitenack did not inform Plaintiff of her workers' compensation rights even though he knew she suffered a workplace injury. *Exhibit 6*, 68:9-15.

v.   When Walmart learns that an employee has become an injured worker, managers such as Quincy Usry and David Whitenack are "supposed to follow" the rules in the "Associate Work-Related Injury Management Guideline." *Exhibit 4*, Deposition of Walmart, 81:18 - 82:5.

vi.   Under Walmart's Associate Work-Related Injury Management Guideline, once an employee reports a workplace injury, the employee is supposed to be given three options, one of which includes the right to "Seek medical attention from a Work Comp provider." *Exhibit 4*, 83:2-20; *Exhibit 6*, 61:14-17; 62:1-24; *Exhibit 16*, Associate Work-Related Injury Management Guidelines (Depo.Ex.41).

vii.   Plaintiff was not provided any of the three options listed in the mandatory Associate Work-Related Injury Management Guideline. *Exhibit 4*, 83:21-23; *Exhibit 6*, 63:7-10.

viii.   Walmart understood it had a duty to report Plaintiff's workplace injury to the State of Kansas. *Exhibit 12*, Depo. of Walmart (Usry – 1/6/21), 9:9-15; 11:1-10.

ix.   Walmart did not report Plaintiff's injury to the State despite knowing it had a duty to report it. *Exhibit 12*, 39:5-11.

x.   Walmart never informed Plaintiff of her right to seek medical treatment between the time it learned she was injured and the time it fired her. *Exhibit 4*, 92:16-20.

xi.   Walmart did not to follow the mandatory policies that applied to itself after learning that an employee suffered a workplace injury. *Exhibit 4*, 109:13-110:2.

**xii.    Walmart did not provide Plaintiff with documentation about her workers' compensation rights as required by the Kansas Department of Labor.** ***See Exhibit 4*, 117:22-118:17; *Exhibit 17*, Information for Injured Employees (Depo.Ex.44).**

64.    On April 14, 2020, shortly after her termination, Braxton exchanged text messages with Sue Sooialo, a Walmart associate who had trained her for the QC Singles position. (Ex. M, Exhibit 29 to Braxton Depo.).

**RESPONSE: UNCONTROVERTED.**

65.    In these texts, Braxton stated that she "just got fired for not reporting my wrist on the night it start[ed] hurting." *(Id.* at 1). She did not mention having reported the injury the shift it happened, or otherwise express a belief that Walmart had gotten the facts wrong. (See, *generally, id.).*

**RESPONSE: UNCONTROVERTED but IMMATERIAL.**

66.    Sooialo expressed her sympathy with Braxton, and stated she disagreed with the termination decision. *(Id.).*

**RESPONSE: UNCONTROVERTED but IMMATERIAL.**

67.    On April 15 at 12:15 a.m.-just a few hours after Braxton's termination- Medaris sent an email to Usry confirming that "[w]e have completed Janell's termination for late reporting." (Ex. N, Usry Dep. Exhibit 5 at 1). Medaris's email reflected her belief that the policy violation, and not the report of injury itself, was the reason for Braxton's termination. *(See id.).*

**RESPONSE: UNCONTROVERTED that the Email was sent.**

**a.    Walmart's contention about Medaris's "belief" is CONTROVERTED because it is an inference that Walmart is asking the Court to draw in its favor. Drawing inferences in Walmart's favor is forbidden because Walmart is the movant seeking summary judgment. *See Tolan v. Cotton*, 572 U.S. 650, 660 (2014). Whether Medaris's email is a "reflection" of her belief requires an inference.**

    **b. Medaris admitted that without knowledge of Ms. Braxton's injury report, Walmart would not have fired her. *Exhibit 13*, Medaris Depo. 20:9-15.**

68.      Medaris also expressed concern that associates were not receiving training on

incident reporting. (*Id.*).

**RESPONSE: UNCONTROVERTED.**

69.      In response to this concern, Usry modified associate training at the Edgerton

facility, to make sure that newly hired associates receive training on Policy 670e. (Ex. F,

Second Usry Depo. at 61:20-62:12).

**RESPONSE: UNCONTROVERTED that Usry made changes to the training program after Plaintiff was fired.**

    **a. Form 670e is not a policy. *See* SOF ¶45(a-f).**

    **b. According to Chelsea Davidson, Walmart's Senior Manager of Human Resources for the Edgerton Fulfillment Center, who is the highest-ranking Human Resources employee at Walmart's facility in Edgerton, Kansas, that facility <u>does not even use</u> Form 670e. *Exhibit 8*, 8:16 - 9:3; 43:3-23; 44:14-17; 44:21-23.**

    **c. According to Chelsea Davidson, Walmart's Edgerton Fulfillment Center has <u>never</u> used Form 670e. *Exhibit 8*, 45:6-9, 19-23.**

70.      He made sure that a copy of Policy 670e was posted at the training school

associates attend during orientation. *(Id.* at 61:24-62:6).

**RESPONSE: UNCONTROVERTED.**

71.      Braxton did not seek medical treatment for her wrist pain, and the pain went

away about a week after her April 14 termination. (Ex. A, Braxton Dep. at 117:2-16).

**RESPONSE: UNCONTROVERTED but IMMATERIAL.**

72.      Braxton also did not ask about medical treatment during her termination meeting.

*(See, generally, id.).*

**RESPONSE: UNCONTROVERTED but IMMATERIAL.**

a. **IMMATERIAL because it is unlawful to fire an employee for suffering a workplace injury that might lead to a workers' compensation claim in the future.** *See Pilcher v. Bd. of Cnty. Comm'rs of Wyandotte Cnty.*, 787 P.2d 1204, 1211 (Kan.App.1990). All <u>three</u> individuals who fired Plaintiff knew she suffered a workplace injury and would not have fired her absent that knowledge. *See* SOF 63(a)(i-iv). Therefore, but for Plaintiff's workplace injury and her report of the same, Plaintiff would not have been fired.

b. **IMMATERIAL because Plaintiff requested medical treatment on April 14, 2020 before being fired.**

    i. **On April 14, 2020, Plaintiff asked her supervisor if Walmart could provide a "brace or wrap" for her wrist because it was bothering her.** *Exhibit 2*, Braxton Depo. 73:2-10; 75:2-9.

    ii. **Plaintiff also requested a brace from the safety cubicle.** *Exhibit 2*, 76:15-22.

    iii. **The safety cubicle did not have braces, but it provided Plaintiff an ointment to treat her pain.** *Exhibit 2*, 77:21 – 78:4.

c. **IMMATERIAL because Walmart refused to offer Plaintiff medical treatment for her workplace injury, thereby violating its own mandatory policy.**

    i. **Under Walmart's Associate Work-Related Injury Management Guideline, once an employee reports a workplace injury, the employee is supposed to be given three options, one of which includes the right to "Seek medical attention from a Work Comp provider."** *Exhibit 4*, 83:2-20; *Exhibit 6*, 61:14-17; 62:1-24; *Exhibit 16*, Associate Work-Related Injury Management Guidelines (Depo.Ex.41).

    ii. **Plaintiff was not provided any of the three options listed in the mandatory Associate Work-Related Injury Management Guideline.** *Exhibit 4*, 83:21-23; *Exhibit 6*, 63:7-10.

73.    Braxton acknowledged that at the termination meeting, no one mentioned workers' compensation. *(Id.* at 119:1-5).

**RESPONSE: UNCONTROVERTED. Walmart did not inform Plaintiff of her workers' compensation rights despite being required to under mandatory company policy and Kansas law. This material fact supports an inference that Walmart's actions were motivated by a desire to prevent Plaintiff from exercising her workers' compensation rights.**

74.    From 2018 to 2020, Walmart terminated 113 seasonal associates from the Edgerton facility because they received a first written discipline. (Ex. O, WM_Braxton_000181); (Ex. P, Declaration of Chelsea Davidson) (authenticating Ex. O as a business record). Plaintiff was the only one who was discharged for failure to report her injury timely.

**RESPONSE: UNCONTROVERTED** that Walmart has terminated 113 seasonal associates, but this fact is **IMMATERIAL.**

**CONTROVERTED** that Plaintiff "was discharged for failure to report her injury timely." Walmart did not cite any evidentiary support for this assertion.

    a.   Operations Manager David Whitenack admitted that if Plaintiff would have never told him she was hurt at work, he would not have had a reason to fire her. *Exhibit 6*, Whitenack Depo. 74:21 – 75:1.

    b.   Whitenack agreed that "if Ms. Braxton would have never reported her workplace injury to Walmart, there would have been no reason to fire her on April 14th, 2020." *Exhibit 6*, 91:7-12.

    c.   Safety Manager Quincy Usry admitted that Plaintiff would not have been fired on April 14, 2020 if she would not have reported her workplace injury. *Exhibit 12*, Usry Depo. 55:18-16:2.

    d.   Human Resources Business Partner Morgan Medaris admitted that without knowledge of Plaintiff's injury report, Walmart would not have fired Plaintiff. *Exhibit 13*, Medaris Depo. 20:9-15.

## **PLAINTIFF'S STATEMENT OF ADDITIONAL MATERIAL FACTS**

75.     **Walmart's Policy Against Discrimination applies to Injured Workers –** Safety Manager Quincy Usry testified on behalf of Walmart regarding "The contents, implementations, and enforcement of Walmart's policies and practices regarding work injuries during Plaintiff's employment." *Exhibit 4*, Depo. of Walmart (Usry – 4/30/21), 9:13 - 10:4, 11:6-11; *Exhibit 20*,

76.     During Plaintiff's employment, Walmart maintained a Discrimination and Harassment Prevention Policy that was supposed to protect Plaintiff from being discriminated against. *Exhibit 4*, 18:7-17; 19:1-14; *Exhibit 19*, Discrimination and Harassment Prevention Policy (Depo.Ex.48).

77.     Walmart's policy recognized that, depending on the motivation, firing an employee could be an act of discrimination. *Exhibit 4*, 20:10-20.

78.     Walmart's policy prohibited an employee from being discriminated against based on a protected status. *Exhibit 4*, 21:16-22:4.

79.     Walmart's policy recognized that being an injured worker or being a person who reported a workplace injury was considered protected statuses upon which the employee may not be discriminated against. *Exhibit 4*, 22:5-24.

80.     **Plaintiff's Employment -** Walmart employed Plaintiff from March 23, 2020 until April 14, 2020. *Exhibit 9*, *Defendant's Answers to Plaintiff's Request for Admissions*, ¶1.

81.     Plaintiff's job required "continuous physical activity" and "[r]epetitive hand motions." *Exhibit 1*, Plaintiff's Job Description (Depo.Ex.21); *Exhibit 2*, 29:20-24.

82.     Plaintiff was a full-time employee. *Exhibit 1*.

83.      Plaintiff was on medical leave from March 29, 2020 until April 11, 2020 for a suspected coronavirus infection. At that time, testing was limited, so she did not get tested, but she was instructed to quarantine due to her symptoms. *Exhibit 2*, Plaintiff Depo. 37:1-38:2.

84.      Plaintiff returned to work symptom-free on April 12, 2020. *Exhibit 2*, 38:23-25.

85.      Plaintiff's first shift back from coronavirus-related medical leave was the night shift that went from April 12, 2020 until April 13, 2020. *Exhibit 2*, 39:9-12.

86.      **Wrist Starts to Hurt –** Around 1:00 AM on April 13, 2020 (first shift back from medical leave), she had pain in her left wrist that she had never felt before. *Exhibit 2*, 48:13 - 49:21.

87.      Plaintiff's wrist started hurting while she was working. *Exhibit 2*, 50:1-6.

88.      There was no specific incident or occurrence that caused Plaintiff's wrist pain. *Exhibit 2*, 50:7-10.

89.      **Plaintiff Reports Her Wrist Pain** – Plaintiff reported her wrist pain to a supervisor at least two times on April 13, 2020. *Exhibit 2*, 51:10-15.

90.      Between 1:00 AM and 5:00 AM on April 13, 2020, although Plaintiff's wrist was hurting, it was not to the point where she was incapacitated from working, so she worked through the pain. *Exhibit 2*, 53:17-24.

91.      Between 1:00 AM and 5:00 AM on April 13, 2020, Plaintiff's direct supervisor was Ammie Wilbur. *Exhibit 9*, *Defendant's Response to Plaintiff's First Request for Admissions*, ¶6. ("Amy" in Plaintiff's deposition – *see Exhibit 2*, 31:7-9).

92.      During the early morning hours of April 13, 2020 (the same shift the pain appeared) Plaintiff told a supervisor her wrist was "really hurting." *Exhibit 2*, 51:18-19; 21-23.

93.      During Plaintiff's next shift, in the evening of April 13, 2020, Plaintiff reported to a supervisor that her wrist was hurting. *Exhibit 2*, 51:24 - 52:4.

94. The second time Plaintiff reported her wrist pain was at the beginning of her evening shift on the evening of April 13, 2020. *Exhibit 2*, 60:13-20; 61:5-24.

95. Plaintiff worked that entire shift, which ended on the morning of April 14, 2020, even though the pain was getting worse. *Exhibit 2*, 62:10-15; 66:10-14.

96. Plaintiff's next shift started in the evening of April 14, 2020, and her supervisor was Ammie Wilbur. *Exhibit 2*, 68:12-25.

97. On April 14, 2020, Plaintiff reported her wrist pain for the third time in two days – this time she approached a supervisor and specifically requested a wrist brace or a wrap to help her get through the shift. *Exhibit 2*, 72:11-17; 73:2-10; 75:2-9.

98. Plaintiff told her supervisor her wrist was still hurting since her initial complaint on the morning of April 13, 2020. *Exhibit 2*, 75:10-14.

99. After the third time Plaintiff reported her wrist pain, her supervisor instructed her to go to the safety cubicle. *Exhibit 2*, 76:15-22.

100. Plaintiff went to the safety cubicle and informed Safety Lead Mark Tuazon about the wrist pain she was experiencing while performing her duties for Walmart (her fourth time reporting the injury), and he provided a muscle ointment. *Exhibit 18*, Tuazon Depo., 18:2 - 19:11.

101. **Safety Lead Mark Tuazon -** As a Safety Lead, Mark Tuazon was required to respond to employee reports of workplace injuries by providing support and medicine if needed. *Exhibit 18*, 4; 6:4-23.

102. When Safety Lead Mark Tuazon receives a report of workplace injury, the first thing he is supposed to do is partner with management, which includes having the injured worker complete an "incident report." *Exhibit 18*, 9:14-22.

103.     Safety Lead Mark Tuazon is required to fill out an "incident report" after learning an employee has reported an injury. *Exhibit 18*, 11:1-5.

104.     Safety Lead Mark Tuazon did not fill out an "incident report" for Plaintiff. *Exhibit 18*, 11:6-9.

105.     Safety Lead Mark Tuazon did not fill out any paperwork to document that he had responded to an employee reporting an injury or to record Plaintiff requested medicine, and he did not ask Plaintiff to fill out any paperwork. *Exhibit 18*, 20:18 – 21:18.

106.     **Plaintiff Leaves the Safety Cubicle -** As Plaintiff returned to her workstation, she told her supervisor the safety cube did not have a brace but provided ointment. *Exhibit 2*, 83:6-13.

107.     After Plaintiff spoke with her supervisor three times on April 14, 2020 about her wrist pain, a male from "upper management" asked her to log off her workstation so she could fill out an "incident report." *Exhibit 2*, 86:1-8.

108.     **Status as Injured Worker & Walmart's Knowledge –** During April 2020, Walmart knew it was illegal to fire someone based on their status as an injured worker, i.e., an employee who suffered a workplace injury, because that would be a legally protected status. *Exhibit 4*, 22:8-14; 22-24.

109.     During April 2020, Walmart knew it was illegal to fire someone in response to them reporting a workplace injury, because reporting a workplace injury would be a legally protected status. *Exhibit 4*, 22:15-21.

110.     During Plaintiff's employment, she suffered a workplace injury, thereby becoming an injured worker. *Exhibit 4*, Deposition of Walmart (Usry – 04/30/21), 23:14-20.

111.     Walmart learned about Plaintiff's status as an injured worker. *Exhibit 4*, 23:21-23.

112.     The reason Walmart learned that Plaintiff was an injured worker was because Plaintiff told someone in her chain of command. *Exhibit 4*, 24:4-7.

113.     **Temporal Proximity –** At the latest, Walmart learned that plaintiff was an injured worker on April 14, 2020. *Exhibit 4*, 23:24 - 24:3.

114.     On April 14, 2020, Operations Manager David Whitenack asked Plaintiff to write a statement on a "Statement Form" and she complied with his request. *Exhibit 6*, 48:1-15.

115.     Operations Manager Whitenack asked Plaintiff to write down "what date and time she recalled experiencing the pain." *Exhibit 6*, 49:19-20.

116.     Operations Manager Whitenack asked Plaintiff to "to write down everything [she] was feeling, that was going on with [her] wrist." *Exhibit 2*, 90:19 – 91:1.

117.     Operations Manager Whitenack did not ask Plaintiff whether she had reported her wrist pain to anyone else. *Exhibit 2*, 87:18-21

118.     Approximately 30 minutes after Plaintiff filled out the Statement Form, Walmart fired her. *Exhibit 4,* 107:7-13; *Exhibit 6*, 49:2-5.

119.     According to Walmart, it fired Plaintiff the same calendar day on which it learned she was an injured worker. *Exhibit 4*, 26:9-12.

120.     **Admissions – By the Decision-Makers** – Safety Manager Quincy Usry, Operations Manager David Whitenack, and Human Resources Business Partner Morgan Medaris were all involved in the decision to fire Plaintiff. *Exhibit 4*, 111:25 - 112:5.

121.     Operations Manager David Whitenack admitted that if Plaintiff would have never told him she was hurt at work, he would not have had a reason to fire her. *Exhibit 6*, 74:21 – 75:1.

122.     Whitenack agreed that "if Ms. Braxton would have never reported her workplace injury to Walmart, there would have been no reason to fire her on April 14th, 2020." *Exhibit 6*, 91:7-12.

123.     Safety Manager Quincy Usry admitted that Plaintiff would not have been fired on April 14, 2020 if she would not have reported her workplace injury. *Exhibit 12*, 55:18-16:2.

124.     Human Resources Business Partner Morgan Medaris admitted that without knowledge of Plaintiff's injury report, Walmart would not have fired Plaintiff. *Exhibit 13*, 20:9-15

125.     **Walmart Violated Its Own Mandatory Policies –** Walmart has a policy called "Dot Com Safety" that applied to every employee at Walmart's facility in Edgerton, Kansas. *Exhibit 4*, 68:7 - 69:4; *Exhibit 11*, Dot Com Safety (Depo.Ex.51).

126.     The Dot Com Safety Manual contains the rules that Walmart is supposed to follow after learning that one of its employees has become an injured worker. *Exhibit 4*, 69:16 – 70:5.

127.     The Dot Com Safety Manual was supposed to be followed after Walmart learned Plaintiff was an injured worker. *Exhibit 4*, 111:14-23.

128.     The Dot Com Safety Manual is mandatory, not discretionary. *Exhibit 4*, 44:10-12.

129.     The Dot Com Safety Manual was available to Safety Lead Mark Tuazon, Operations Lead Ammie Wilbur, Safety Manager Quincy Usry, Operations Manager David Whitenack, and Human Resources Business Partner Morgan Medaris. *Exhibit 4*, 43:2-18.

130.     Safety Manager Quincy Usry received specific training on the Dot Com Safety Manual and trained other employees on the Manual. *Exhibit 4*, 93:9-21.

131.     The Dot Com Safety Manual was not available to Plaintiff. *Exhibit 4*, 42:14-16.

132.     During April 2020, Quincy Usry was aware of the mandatory rules set forth in the Dot Com Safety Manual. *Exhibit 4*, 93:19-21.

133.     The Dot Com Safety Manual defines "incidents" as "Any unexpected, unplanned or abnormal event or series of events that occurs and does result in an injury." *Exhibit 4*, 70:17 - 71:11; *Exhibit 11*.

134.     To qualify as an "incident" there has to be something "unexpected, unplanned or abnormal." *Exhibit 4*, 71:17-21.

135.     An employee engaged in their regular job is not unexpected, unplanned, or abnormal. *Exhibit 4*, 72:1-18.

136.     The Dot Com Safety Manual defines "injury" as "an abnormal condition or disorder." *Exhibit 4*, 73:3-9.

137.     An employee who is feeling sore from doing their job has not experienced an "injury incident" under Walmart's policies. *Exhibit 4*, 77:23 - 78:1.

138.     Walmart acknowledges that repetitive motion that initially causes soreness can eventually lead to an injury. *Exhibit 4*, 78:25 – 79:6.

139.     **Dot Com Procedures after Injury** – The Dot Com Safety Manual provides management with links to other documents and policies they are supposed to follow in response to learning an employee has been injured. *Exhibit 4*, 80:3-81:3; *Exhibit 11*.

140.     According to Walmart, Plaintiff reported an injury to David Whitenack, which required Walmart to follow the rules in the Dot Com Safety Manual. *Exhibit 4*, 85:7 - 86:2.

141.     The mandatory rules set forth in the Dot Com Safety Manual should have been followed in relation to Plaintiff. *Exhibit 4*, 104:10-14.

142.     The Dot Com Safety Manual requires a member of Human Resources or the Safety Manager to complete a "First Report of Injury Form" if required by the State. *Exhibit 4*, 86:14-17.

143.     Walmart never completed a "First Report of Injury Form" for Plaintiff. *Exhibit 4*, 86:18-20.

144.     Walmart never looked to see if the State of Kansas required a First Report of Injury Form. *Exhibit 4*, 86:21-25.

145.     The Dot Com Safety Manual provides a link for Walmart's employees to see whether the State they are in requires a First Report of Injury. *Exhibit 4*, 87:4-13.

146.     Quincy Usry claims he usually asks Walmart's Claims Management team to determine whether a First Report of Injury is required, but he chose not to do that for Plaintiff. *Exhibit 4*, 87:14-23.

147.     **Walmart was Required To Report Plaintiff's Injury –** The Dot Com Safety Manual provides management with "state specific required forms." *Exhibit 4*, 117:16-21; *Exhibit 11* (WM_Braxton_000195).

148.     The Kansas Department of Labor requires Walmart to provide an injured worker with information set forth in a document it makes available to employers like Walmart. *Exhibit 4*, 117:12-118:6; *Exhibit 17*, Information for Injured Employees (Depo.Ex.44).

149.     Walmart knew at least by April 14, 2020 that Plaintiff was an injured worker. *Exhibit 4*, 118:7-10.

150.     Walmart never provided Plaintiff with the document from the Kansas Department of Labor that it was supposed to provide or any other document with the same information. *Exhibit 4*, 118:11-17.

151.     Walmart understood it had 28 days to report Plaintiff's injury to the State of Kansas. *Exhibit 4*, 118:23 – 119:19.

152.    Walmart never reported Plaintiff's workplace injury to the State of Kansas. *Exhibit 4*, 119:20 - 120:3.

153.    **Filling out an Incident Report is Required -** The Dot Com Safety Manual requires management to ask an injured associate, such as Plaintiff, to complete, sign, and date a Medical Authorization and "Associate Incident Report." *Exhibit 4*, 88:12-21; *Exhibit 11*.

154.    The Dot Com Safety Manual rule about having an employee complete the Associate Incident Report is mandatory, not discretionary. *Exhibit 4*, 88:20 – 89:21.

155.    According to Walmart, it failed to have Plaintiff fill out an Associate Incident Report. *Exhibit 4*, 89:25 – 90:16.

156.    According to Walmart, Quincy Usry and Morgan Medaris violated the mandatory rule that required them to have Plaintiff fill out an Associate Incident Report. *Exhibit 4*, 90:12-24.

157.    Safety Manger Quincy Usry says he did not instruct David Whitenack to have Plaintiff fill out an Associate Incident Report even though that was his obligation under the mandatory Dot Com Safety Manual. *Exhibit 4*, 91:6-13.

158.    According to Plaintiff, Whitenack did ask her to fill out an "incident report." *Exhibit 2*, 90:21-23; 91:2-5. (Walmart did not produce any such document during discovery).

159.    The Associate Incident Report form asks the associate to state the date and time of the incident. *Exhibit 4*, 91:19-25; *Exhibit 15*.

160.    The Associate Incident Report form asks the associate to state the date and time she first reported the incident. *Exhibit 4*, 92:1-3; *Exhibit 15*.

161.    The Associate Incident Report form asks the associate to identify who the incident has been reported to. *Exhibit 4*, 92:4-6; *Exhibit 15*.

162.     The Associate Incident Report form asks the associate to state whether she wanted medical treatment. *Exhibit 4*, 92:12-15; *Exhibit 15*.

163.     **Using a Statement Form Violated Walmart Policy –** The Statement Form Quincy Usry and David Whitenack had Plaintiff fill out is not the form required by the Dot Com Safety Manual. *Exhibit 4*, 104:24 – 105:5.

164.     The Statement Form Plaintiff was asked to fill out was supposed to be filled out by witnesses who were asked to provide statements during an investigation. *Exhibit 4*, 105:6-21.

165.     **An Investigation was Required under Walmart Policy –** The Dot Com Safety Manual requires the manager of an injured associate to conduct an investigation and record the investigation in a document called WMV-738e. *Exhibit 4*, 93:22 – 94:14; *Exhibit 11*.

166.     Conducting an investigation after learning that an employee has become an injured worker is mandatory, not discretionary. *Exhibit 4*, 94:11-20.

167.     David Whitenack was required to conduct an investigation after learning of Plaintiff's workplace injury and to record his investigation in a WMV-783e. *Exhibit 4*, 95:2-17.

168.     David Whitenack did not conduct an investigation. *Exhibit 6*, 103:11-13.

169.     David Whitenack never completed a Safety Incident Investigation Form (738e) even though it was required by Walmart policy. *Exhibit 4*, 96:5-21.

170.     There are no exceptions to the mandatory Walmart policy requiring an investigation. *Exhibit 4*, 97:3-14.

171.     David Whitenack was supposed to submit the completed Safety Investigation form to Quincy Usry, but he never did. *Exhibit 4*, 98:1-24.

172.     The Dot Com Safety Manual required 8 steps be completed to document an investigation, but none of them were completed in response to Walmart learning Plaintiff was an injured worker. *Exhibit 4*, 99:9-17; *Exhibit 11*.

173.     **Daily Contact with Plaintiff was Required by Walmart Policy -** The Dot Com Safety Manual required David Whitenack to have daily contact with Plaintiff for at least seven days after learning that she was an injured worker. *Exhibit 4*, 99:25-100:15.

174.     David Whitenack did not speak to Plaintiff after he fired her. *Exhibit 6*, 16:25-17:1.

175.     **A "5 Why" Form Was Required by Walmart Policy –** Walmart maintains a document called the "5 Why" that is supposed to be used after an employee becomes an injured worker. *Exhibit 4*, 97:16-23.

176.     Walmart did not use the 5 Why in relation to Plaintiff. *Exhibit 4*, 97:24-25.

177.     **Internally Recording Plaintiff's Injury was Required by Walmart Policy –** The Dot Com Safety Manual contained a mandatory rule that required David Whitenack, Moran Medaris, or Quincy Usry to record Plaintiff's workplace injury in Walmart's internal Incident Reporting System within 24 hours. *Exhibit 4*, 100:24 – 101:25.

178.     Plaintiff's injury was not recorded in Walmart's Incident Reporting System. *Exhibit 4*, 102:1-2.

179.     **Walmart was Required to Provide Plaintiff with Three Options that She was Not Provided –** Walmart has an "Associate Work-Related Injury Management Guideline" that Quincy Usry and David Whitenack were supposed to follow after learning that an employee has become an injured worker. *Exhibit 4*, 81:12 - 82:5; *Exhibit 16* (Depo.Ex.41).

180.    When Walmart learns that an employee has become an injured worker, managers such as Quincy Usry and David Whitenack are "supposed to follow" the rules in the "Associate Work-Related Injury Management Guideline." *Exhibit 4*, Deposition of Walmart, 81:18 - 82:5.

181.    Under Walmart's Associate Work-Related Injury Management Guideline, once an employee reports a workplace injury, the employee is supposed to be given three options, one of which includes the right to "Seek medical attention from a Work Comp provider." *Exhibit 4*, 83:2-20; *Exhibit 6*, 61:14-17; 62:1-24; *Exhibit 16*, Associate Work-Related Injury Management Guidelines (Depo.Ex.41).

182.    Plaintiff was not provided any of the three options listed in the mandatory Associate Work-Related Injury Management Guideline. *Exhibit 4*, 83:21-23; *Exhibit 6*, 63:7-10.

183.    **Issuing Discipline is Not Required by Walmart Policy** – The Dot Com Safety Manual says "Associates involved in an incident will report it to their managers immediately. Failure to do so **may** result in disciplinary action." *Exhibit 4*, 112:9 – 113:5; *Exhibit 11*.

184.    Disciplining an employee for not reporting an incident is discretionary. *Exhibit 4*, 113:6 – 114:12.

185.    Usry had discretion regarding whether to discipline Plaintiff. *Exhibit 4*, 114:13-18.

186.    For issuing discipline, the Dot Com Safety Manual instructs management to "Refer to the WMW-670e eCommerce Safety and Compliance Rule Violation form." *Exhibit 11* (WM_Braxton_000197).

187.    **Firing Plaintiff Violated Walmart Policy** – If management exercises their discretion to issue discipline to an employee for not reporting an injury immediately, the Dot Com Safety Manual provides instructions. *Exhibit 4*, 114:19-23; *Exhibit 11* (WM_Braxton_000198).

188.     First, an investigation is supposed to be completed before deciding whether a safety or compliance violation occurred. *Exhibit 11* (WM_Braxton_000198).

189.     The Dot Com Safety Manual says, "If a safety or compliance violation occurred, the manager issues the appropriate per the WMW-670e eCommerce Safety and Compliance Rule Violation form." *Exhibit 4*, 115:13-18; *Exhibit 11* (WM_Braxton_000198).

190.     If management decides to issue discipline, the Dot Com Safety Manual requires them to use the Form 670e to issue the discipline. *Exhibit 4*, 115:19 – 116:23; *Exhibit 7*, Form 670e (Depo.Ex.11).

191.     According to the Form 670e, failure to report any known injury before the end of the shift is supposed to result in a Step 1 violation issued on the Form 670e. *Exhibit 4*, 116:24 – 117:5.

192.     Walmart failed to use the Form 670e for Plaintiff despite being required to by its own policies. *Exhibit 4*, 117:6-8. F

193.     **Firing Plaintiff was Not Required by the Policies Walmart Says it Relied On –** According to Safety Manager Quincy Usry, Plaintiff was fired because she violated two Walmart documents: Policy 763e and Form 670e. *Exhibit 4*, 26:22 - 27:6; 27:14-24; 28:7-19.

194.     Walmart's Policy 763e – "General Safe Work Practices" states, under a heading "Safety Related Incidents," says, "All known injuries, no matter how slight, will be reported to a member of management by the end of the shift." *Exhibit 4*, 39:1-10; *Exhibit 5*.

195.     Policy 763e does not define "Safety Related Incidents." *Exhibit 4*, 39:19-22.

196.     Policy 763e does not define "injuries." *Exhibit 4*, 39:24 - 40:2.

197.     Walmart's 763e does not say an employee can be fired for failing to report a workplace injury by the end of the shift. *Exhibit 4*, 41:16-19.

198.     Walmart's 763e does not say an employee can be disciplined for failing to report a workplace injury by the end of the shift. *Exhibit 4*, 41:20-24.

199.     The other document Walmart says Plaintiff violated was the Form 670e, which is a template that is supposed to be used to issue documentation for safety violations, but it is not a policy. *Exhibit 4*, 46:11-21; 50:5-8; *Exhibit 7*, Form 670e (Depo.Ex.11)

200.     On the Form 670e, there is one bullet point under the heading "Step 1" that says, "Failure to report any known injury before the end of the shift." *Exhibit 4*, 47:3-10; *Exhibit 7*.

201.     Form 670e does not define the work "injury." *Exhibit 4*, 49:11-13.

202.     According to the Form 670e, if an associate fails to report a known injury by the end of the shift in which it happened, the employee should receive a "Step 1" violation, which means that an employee may receive a Step 3 or be fired if the same violation happens within the next 180 days. *Exhibit 4*, 50:13-20; *Exhibit 7*.

203.     Walmart's corporate representative Quincy Usry testified that a Step 1 would be issued for "full time associates." *Exhibit 4*, 50:20.

204.     Plaintiff was an "associate" of Walmart. *Exhibit 4*, 19:11-14; 83:17-20.

205.     Quincy Usry knew Plaintiff was a full-time employee. *Exhibit 4*, 51:16-23.

206.     **Injury vs. Soreness -** Walmart acknowledges that under its policies, there is a difference between injury and soreness. *Exhibit 4*, 66:7-10.

207.     According to Walmart's Safety Lead Mark Tuazon, Walmart does not consider soreness the same as injury. *Exhibit 18*, 17:18.

208.     According to Walmart's Operation Manager David Whitenack, "soreness and injury … are two totally different things." *Exhibit 6*, 30:13-20.

209.     Policy 763e does not distinguish between an injury and soreness. *Exhibit 4*, 40:3-6.

210.     Walmart's 763e does not say employees must report soreness. *Exhibit 4*, 44:19-24.

211.     Walmart's 763e does not say an employee can be fired for failing to report soreness during the shift in which it occurs. *Exhibit 4*, 46:2-6.

212.     Form 670e does not distinguish between injury and soreness. *Exhibit 4*, 49:14-16.

213.     Form 670e does not reference failure to report soreness by the end of the shift. *Exhibit 4*, 49:17-19.

214.     Walmart's Policy 763e and Form 670e have a combined total of 308 bullet points, and only two of them relate to reporting workplace injuries during the same shift in which they occur. *Exhibit 4*, 53:18 - 55:1.

215.     None of the 308 bullet points informed an employee that they could lose their job for failing to report a workplace injury. *Exhibit 4*, 67:14-18.

216.     **Lack of Training -** Walmart's Policy 763e, was made available to Plaintiff before she became an employee of Walmart, but Plaintiff never received training about it. *Exhibit 4*, 30:14-21; 32:17-23.

217.     The Form 670e was made available to Plaintiff before she became an employee of Walmart, but Plaintiff never received training about the Form 670e. *Exhibit 4*, 47:17 - 48:4.

218.     Neither the 763e nor the 670e define what a known injury is. *Exhibit 4*, 55:18-23.

219.     Neither the 763e nor the 670e define what an incident is. *Exhibit 4*, 55:24-56:1.

220.     Neither document explains the difference between soreness and injury. *Exhibit 4*, 66:11-14; *Exhibit 5, Exhibit 7*.

221.     Walmart did not train Plaintiff regarding the difference between soreness and injury. *Exhibit 4*, 66:15-20.

222.    An employee who is feeling sore from doing their job has not experienced an "injury incident" under Walmart's policies. *Exhibit 4*, 77:23 - 78:1.

223.    Walmart acknowledges that repetitive motion that initially causes soreness can eventually lead to an injury. *Exhibit 4*, 78:25 – 79:6.

224.    **Safety School did not Cover Workplace Injuries –** At the beginning of Plaintiff's employment, she went through Walmart's Safety School training. *Exhibit 4*, 48:5-7.

225.    During Safety School, Walmart did not inform Plaintiff she was supposed to report a workplace injury during the same shift in which it happened. *Exhibit 4*, 49:6-10.

226.    **Plaintiff was the Only Employee Disciplined -** Plaintiff was the only employee who was disciplined after Walmart learned that she was an injured worker. *Exhibit 4*, 121:14-17.

227.    Quincy Usry and David Whitenack failed to comply with more than two mandatory rules set forth in the Dot Com Safety Manual. *Exhibit 4*, 103:6-15.

228.    All the rules that Quincy Usry and David Whitenack failed to follow were mandatory rules. *Exhibit 4*, 108:2-5.

229.    As of April 30, 2021, neither David Whitenack nor Quincy Usry had been disciplined for their violations of the Dot Com Safety Manual. *Exhibit 4*, 103:16-24; *Exhibit 8*, 67:14-18.

230.    David Whitenack did not receive discipline for failing to conduct the safety investigation he was required to perform. *Exhibit 4*, 99:3-8.

231.    Safety Lead Mark Tuazon was subject to discipline for not reporting Plaintiff's workplace injury to management. *Exhibit 6*, 94:2-8.

232.    Safety Lead Mark Tuazon was not disciplined for failing to follow the policies that applied to him in relation to learning Plaintiff was an injured worker. *Exhibit 8*, 67:14-18.

233.     **Walmart Refused to Inform Plaintiff of Her Workers' Compensation Rights** – Operations Manager David Whitenack did not provide Plaintiff any information about her right to seek medical treatment for her workplace injury. *Exhibit 6*, 97:19-24.

234.     Between the time Operations Manager David Whitenack received Plaintiff's Statement Form and when he fired her 30 minutes later, he did not witness anyone provide her information about her right to seek medical treatment. *Exhibit 6*, 99:15-21.

235.     After Walmart learned Plaintiff suffered a workplace injury, but before Walmart fired her, Walmart never provided Plaintiff information about her right to seek medical treatment. *Exhibit 4*, 92:16-20.

236.     **Walmart Did Not Investigate Its Purported Basis for Firing Plaintiff** – Walmart did not ask Plaintiff to write a statement as to when, how, or with whom she had reported her workplace injury to prior to April 14, 2020. *Exhibit 12*, Walmart Depo. (Usry - 1/6/21), 27:1-6.

237.     Walmart never asked Ammie Wilbur to write a statement about when Plaintiff first reported her wrist pain. *Exhibit 12*, 27:7-12.

238.     Walmart never conducted an investigation to find out when Plaintiff first reported her workplace injury. *Exhibit 12*, 41:1-5.

239.     Walmart could have conduced an investigation to find our when Plaintiff first reported her workplace injury. *Exhibit 12*, 41:6-7.

240.     Walmart chose not to conduct an investigation to find out when Plaintiff first reported her workplace injury. *Exhibit 12*, 41:14-17.

241.     Walmart acknowledges that whether Plaintiff reported her wrist pain on April 13, 2020 is genuinely disputed. *Exhibit 12*, 45:16- 46:13.

242.     Walmart denied Plaintiff had a workplace injury on April 13, 2020. *Ex. 9*, ¶5.

## ARGUMENT AND AUTHORITIES

Plaintiff alleges "Walmart violated the common law of Kansas prohibiting retaliatory discharge when it fired Plaintiff." *Pretrial Order* (Doc.93) at 11(4)(a). Specifically, "Walmart fired Plaintiff based on her status as an injured worker, i.e., because she suffered a workplace injury, because she reported a workplace injury, and/or because she requested medical treatment for a workplace injury." *Id.* There is sufficient evidence to show Walmart fired Plaintiff for these reasons. Based on Walmart's disregard for its own mandatory policies that are supposed to protect Plaintiff's rights, a jury could conclude Walmart fired Plaintiff to avoid workers' compensation liability, thereby violating the common law of Kansas.

Since 1981, Kansas has recognized the tort of retaliatory discharge where an employer fires an employee for exercising rights under the Kansas Workmen's Compensation Act. *See Murphy v. City of Topeka-Shawnee Cnty. Dept. of Labor Servs.*, 630 P.2d 186, 192-93 (Kan.App.1981). This claim is rooted in the "public policy" of Kansas. *Id.* at 192.

> The Workmen's Compensation Act provides efficient remedies and protection for employees, and is designed to promote the welfare of the people in this state. It is the exclusive remedy afforded the injured employee, regardless of the nature of the employer's negligence. **To allow an employer to coerce employees in the free exercise of their rights under the act would substantially subvert the purpose of the act.**

*Id.* (bold added). A company that fires an employee to subvert her workers' compensation rights has acted unlawfully. Accordingly, an employee cannot be fired for making a claim for workers' compensation or for suffering a workplace injury that might result in such a claim. *See Pilcher v. Bd. of Cnty. Comm'rs of Wyandotte Cnty.*, 787 P.2d 1204, 1211 (Kan.App.1990). Whether that happened to Plaintiff is the ultimate issue in this case and contested in summary judgment.

Generally, when analyzing a claim of retaliatory discharge at summary judgment, courts employ the classic burden-shifting analysis. *See Rebarchek v. Farmers Co-Op Elevator*, 35 P.3d

892, 898-99 (Kan.2001).[1] However, whether burden shifting applies depends on whether the plaintiff provides direct evidence or only circumstantial evidence. *EEOC v. Horizon/CMS Healthcare Corp.*, 220 F.3d 1184, 1191 (10th Cir. 2000). A plaintiff can defeat summary judgment by either offering direct evidence of discrimination or by using circumstantial evidence to create an inference of discrimination under the *McDonnel Douglas* burden-shifting analysis. *Hare v. Denver Merchandise Mart, Inc.*, 255 Fed.Appx. 298, 301 (10th Cir. 2007). In this case, summary judgment should be denied because there is direct evidence that Plaintiff was fired in retaliation for suffering and reporting a workplace injury.[2]

## I.   Direct Evidence shows Walmart fired Plaintiff for being an Injured Worker

"When direct evidence is presented, *McDonnell Douglas's* burden-shifting scheme is inapplicable." *Fischer v. Forestwood Co., Inc.*, 525 F.3d 972, 983 (10th Cir. 2008); *accord Tomsic v. State Farm Auto Ins.*, 85 F.3d 1472, 1477 (10th Cir. 1996). The US Supreme Court agrees. *See Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121 (1985) ("the *McDonnell Douglas* test is inapplicable where the plaintiff presents direct evidence of discrimination).

Direct evidence does not mean an admission. Direct evidence is evidence showing a "nexus" between a protected class and an adverse employment action. *See Perry v. Woodward*, 199 F.3d 1126, 1134 (10th Cir. 1999). It must show a protected class was "actually relied on"

---

[1] According to the Kansas Supreme Court, "[the plaintiff] need not meet the clear and convincing standard at the summary judgment stage of the proceedings." *Rebarcheck v. Farmers Co-op Elevator*, 35 P.3d 892, 898 (Kan. 2001). Walmart's contrary assertion should be disregarded.

[2] The Court addressed Plaintiff's direct evidence argument in denying *Plaintiff's Motion for Partial Summary Judgment* and concluded the evidence did not establish liability in favor of Plaintiff. *See Memorandum and Order* (Doc.87) at 13. Plaintiff repeats the argument here because there is additional testimony from the two other decision-makers confirming a causal link between Plaintiff's act of reporting a workplace injury and getting fired. And here, the evidence is not viewed in Walmart's favor.

when making an employment decision without making an inference. *Tabor v. Hilti, Inc.*, 703 F.3d 1206, 1217 (10th Cir. 2013). Comments by a decision maker can be direct evidence if they directly relate to the plaintiff, the protected class at issue, and show a nexus between the protected class and the adverse action at issue. *See id.* In *Tabor*, the decision maker expressed his opinion that women do not have adequate knowledge of tools, and then refused to hire a woman to be a tool salesperson. *Id.* at 1217. The decision maker did not admit his beliefs caused his decision. *See id.* Nevertheless, the Tenth Circuit recognized his comments were direct evidence of sex discrimination. In this case, all three decision makers provided testimony showing that Plaintiff would still be employed if she did not suffer and workplace injury and report it.

Three Walmart employees were involved in the decision to fire Plaintiff: Safety Manager Quincy Usry, Operations Manager David Whitenack, and Human Resources Business Partner Morgan Medaris. (SOF ¶120). All three individuals testified that Plaintiff would not have been fired if she did not report her workplace injury. (SOF ¶¶121-124). Whitenack agreed there would not have been a reason to fire Plaintiff if she did not report being hurt. (SOF ¶¶121-22). So did Usry and Medaris. (SOF ¶¶123-124). Walmart argues it was not Plaintiff's injury or report of injury that caused her termination alone, but it was also the timing of it. However, that clarification is immaterial under Kansas law.

A plaintiff alleging retaliatory discharge does "not need to show that retaliation was the employer's sole motive or reason for the termination." *Sanjuan v. IBP, Inc.*, 160 F.3d 1291, 1298 (10th Cir. 1998). "Employees can recover by proving that the discharge was 'based on,' 'because of,' 'motivated by,' or 'due to' the employer's intent to retaliate." *Id.* The testimony of Whitenack, Medaris, and Usry reveal that Plaintiff was fired for suffering and reporting a workplace injury. Their explanation is like the manager's explanation in *Tabor v. Hilti*. They have articulated a

different reason, but a direct link can be drawn between the statements, the adverse employment action, and the protected class. This direct evidence is sufficient to deny summary judgment without further analysis. Even if burden shifting applies, Walmart's Motion should be DENIED.

## II. Circumstantial Evidence shows Walmart fired Plaintiff for being an Injured Worker

In the absence of direct evidence, *McDonnell Douglas* burden-shifting applies. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993). Under this framework, a plaintiff must first establish a prima face case. *Id.* A prima facie case shifts the burden of production to the employer, who must articulate a legitimate (i.e., not illegal) motive for its actions. *Id.* Then the burden shifts back to the plaintiff to demonstrate the articulated reason is pretext. *See id.* at 515-16. If the plaintiff shows a jury *could* find the reason did not motivate the adverse action, then summary judgment should be denied. *Id.* at 510-11. Nothing more is needed. *Id.* The Tenth Circuit has "definitively rejected a 'pretext plus' standard." *Swackhammer v. Sprint/Utd Mgmt. Co.*, 493 F.3d 1160, 1167 (10th Cir. 2007). "[I]n order to survive summary judgment, a plaintiff generally need not provide affirmative evidence of discrimination beyond the prima facie case and evidence that the employer's proffered explanation is pretextual." *Id.*

### a. Prima Facie Case

When assessing the prima facie case, the moving party's evidence is disregarded. *See Ellison v. Sandra Nat'l Labs.*, 60 Fed.Appx. 203, 205 (10th Cir. 2003). The employer's evidence should only be considered in the second and third steps. *Kenworthy v. Conoco, Inc.*, 979 F.2d 1462, 1469-70 (10th Cir. 1992). "At the prima facie stage of the *McDonnell Douglas* analysis, a plaintiff is only required to raise an inference of discrimination, not dispel the non-discriminatory reasons subsequently proffered by the defendant." *EEOC v. Horizon/CMS Healthcare Corp.*, 220 F.3d

1184, 1193 (10th Cir. 2000). The threshold for making a prima facie case is very low. *See Orr v. City of Albuquerque*, 417 F.3d 1144, (10th Cir. 2005).

To demonstrate a prima facie case of retaliatory discharge, Plaintiff must show:

> (1) she sustained an injury that might result in workers' compensation;
>
> (2) Walmart knew of her workplace injury;
>
> (3) Walmart terminated Plaintiff's employment; and
>
> (4) there is a causal connection between the injury and the termination.

*Sanjuan v. IBP, Inc.*, 160 F.3d 1291, 1298 (10th Cir. 1998).

These elements are undisputed. On April 13, 2020, Plaintiff's wrist started to hurt while she was working. (SOF ¶86). The first four times Plaintiff reported her workplace injury may be disputed (SOF ¶¶89-100), but Walmart admits that on April 14, 2020, it learned Plaintiff suffered a workplace injury after Plaintiff reported it to an supervisor. (SOF ¶¶110-113). There is no dispute that Walmart fired Plaintiff. (SOF ¶119). The evidence establishing a causal connection for purposes of a prima facie case is also undisputed.

"For purposes of establishing a prima facie case of retaliation, a plaintiff can establish a causal connection by temporal proximity between the protected activity and adverse action." *Fye v. Oklahoma Corp. Comm'n*, 516 F.3d 1217, 1228 (10th Cir. 2008). In *Fye*, temporal proximity of "less than two weeks" was sufficient, even standing alone, to establish a causal connection for a prima facie case. *Id.* The same was true for temporal proximity of 24 days. *See Argo v. Blue Cross and Blue Shield of Kansas, Inc.*, 452 F.3d 1193, 1202 (10th Cir. 2006). Here, the timing is closer.

According to Walmart, it fired Plaintiff less than 30 minutes after she submitted a Statement Form about her workplace injury. (SOF ¶114-118). Walmart claims Plaintiff was fired the same day it learned of her workplace injury. (SOF ¶119). Of course, Plaintiff says she reported

her wrist pain the day before she was fired. (SOF ¶¶89-94). Either way, the temporal proximity alone establishes the causal connection for Plaintiff's prima facie case.

### b. **Walmart's Explanation is Not Legitimate**

Once the employee makes a prima facie case, the burden shifts to the employer to "articulate some legitimate, nondiscriminatory reason for [taking the action]." *McDonnell Douglas Corp. v. Green*, 411 US 792, 802-803 (1973). The proffered reason must be wholly separate from the protected class at issue. *See, e.g., Jaramillo v. Colorado Judicial Dept.*, 427 F.3d 1303, 1307 (10th Cir. 2005). For example, when a plaintiff alleges she is not chosen for a job based on her sex, the employer must provide a sex-neutral reason for its action. *See id*. Walmart has failed to meet this burden of production.

The Workmen's Compensation Act is a "state public policy conferring on all employees and employers certain nonnegotiable rights and imposing certain nonnegotiable duties and obligations…." *Coleman v. Safeway Stores, Inc.*, 752 P.2d 645, 650-51 (Kan.1988). This Act provides the "public policy" supporting a claim of retaliatory discharge. *See id*. Employers in Kansas cannot fire employees for a reason that is "violative of an established or statutorily declared public policy." *Id. at* 648. The public policy is "declared by the legislature or by the courts." *Hysten v. Burlington N. Santa Fe Ry.*, 108 P.3d 437, 440 (Kan.2004). Since 1981, the public policy of Kansas, as recognized by the courts, has been that an employee cannot be fired for exercising rights under the Workmen's Compensation Act. *Id.* The public policy of providing compensation to injured employees "would be undermined if the worker could be fired for the exercise of his or her statutory right." *Id.* at 441. Requiring employees to choose between reporting a workplace injury and being fired would "effectively release[] an employer from the obligation of the statute." *Id.*

"Under the Kansas Constitution, the primary lawmaking body is the legislature." *Coleman*, 752 P.2d at 648. Under Kansas law, an employee has 20 days to report an injury to their employer without sacrificing their workers' compensation rights. K.S.A. § 44-520(a)(1)(A). If Walmart maintains a policy of firing employees for reporting a workplace injury the day after it happens, Walmart is undermining the public policy established by the Kansas legislature.

Walmart previously argued that the Supreme Court of Kansas approved employers making company policies that require an injury to be reported in less time than the statute. *See Defendant's Sur-Reply Brief in Opposition to Summary Judgment* (Doc.64-1) at 4-5. That is inaccurate. In the case cited by Walmart, the Kansas Supreme Court was not deciding whether an employer may enforce a policy requiring employees to report injuries in less time than the applicable statute. *See Asp v. McPherson Cnty. Hwy. Dept.*, 388 P.2d 652, 655 (Kan.1964). In *Asp*, an injured worker provided late notice of his claim for compensation and commenced a claim for compensation after the statutory period. *Id*. at 652-53. The employee argued statute of limitations should be tolled because the employer engaged in constructive fraud. *Id.* at 655. He argued the company's policy requiring injuries to be reported in seven days was fraudulent. *See id.* The Court never approved the rule; instead, it held that there was no evidence the employee relied on the rule in deciding not to report the injury to his employer. *Id*. In addition, the employee's claim for compensation was denied for not proving written notice of the actual claim within 180 days or filing his claim within one year. *See id.* at 655-56. Accordingly, *Asp v. McPherson* does not support Walmart's argument that it may fire employees for reporting injuries within the 20-day limit set by the legislature.

The Kansas Statute recognizes that "repetitive trauma" can cause a workplace injury. *See* K.S.A. § 44-520(a)(1)(A). Walmart's policies recognize the same, *i.e.,* that repetitive motion may initially cause soreness that eventually develops into an injury. (SOF ¶138). Plaintiff's job with

Walmart required "continuous physical activity" and "repetitive hand motions." (SOF ¶81). An employee engaged in their regular job and feeling pain has not yet experienced an injury under Walmart policies. (SOF ¶¶133-137). Walmart's policies recognize there is a difference between an "injury" and "soreness." (SOF ¶¶206-208). Under Kansas law, an employee should have 20 days to report an injury to their employer even if it was caused by repetitive trauma. The resulting injury might not become readily apparent. Hence the 20-day reporting deadline.

Under the policy argument Walmart advances in this case, an employee can be fired for reporting an injury caused by repetitive trauma unless the employee reported the pain the first time the pain was felt. This argument not only undermines Walmart's policies, it undermines the public policy of Kansas as reflected in K.S.A. § 44-520(a). Walmart's purported reason for firing Plaintiff is not legitimate. It is directly tied to her status as an injured worker, which is protected from retaliation under Kansas law and under Walmart's own policies. (SOF ¶¶75-79).

Even if the Court decides Walmart's articulated reason for firing Plaintiff shifts the burden back to Plaintiff, summary judgment should still be denied because there is sufficient evidence that could cause a jury to find the real reason Plaintiff was fired was due to retaliation.

### c.  **Evidence of Pretext**

"A plaintiff may show pretext by demonstrating weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons." *Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1179 (10th Cir. 1999). The issue is whether the evidence *could* allow the jury to disbelieve the employer. *Id.* at 1180. Summary judgment must be denied if a jury *could* find the employer's explanation is not the true motivation. *See Reeves*, 530 U.S. at 147.

"A plaintiff may not be forced to pursue any particular means of demonstrating that a defendant's stated reasons are pretextual." *Swackhammer*, 493 F.3d at 1168. Ultimately, "the combination of suspicious timing with other significant evidence of pretext can be sufficient to survive summary judgment." *Burton v. Freescale Semiconductor, Inc.*, 798 F.3d 222, 240 (5th Cir. 2015). When deciding whether a plaintiff has shown pretext, the Court must consider the "totality of th[e] evidence" and "draw[] all reasonable inferences in [the Plaintiff]'s favor." *Fassbender v. Correct Care Solutions, LLC*, 890 F.3d 875, 890 (10th Cir. 2018); *accord Sanders v. SW Bell Telephone, L.P.*, 544 F.3d 1101, 1111 (10th Cir. 2008).

**<u>Testimony of the Decision-Makers</u>**

Even if the Court decides the testimony of Whitenack, Usry, and Medaris is not direct evidence of a retaliatory discharge, it must consider it in the pretext analysis. Comments suggesting an illegal motive can be evidence of pretext, even if the comments fall short of being direct evidence. *Santiago-Ramos v. Centennial P.R. Wireless Corp.*, 217 F.3d 46, 54 (1st Cir. 2000). Therefore, this Court should "begin where [it] left off with [Plaintiff]'s direct evidence argument." *Fassbender*, 890 F.3d at 884. In *Fassbender*, the Tenth Circuit held that a supervisor's comments about having too many pregnant workers was evidence of pretext despite not being direct evidence because it was not directly tied to the termination decision. *Id.* at 885-886.

The testimony of the decision makers in this case reveal that if Plaintiff would have never reported her workplace injury, she never would have been fired. That is the ultimate fact that all three decision makers agree on in this case. (SOF ¶¶120-124). The testimony of the decision makers in this case is directly related to the termination, which was not the case in *Fassbender*. Considered with the rest of Plaintiff's pretext evidence, a jury could find that Plaintiff was fired due to retaliation, and not for a legitimate reason.

**Walmart's Explanation is False**

A jury could find Walmart's purported reason for firing Plaintiff is pretext because it is false. A plaintiff can show pretext by showing that the employer's "explanation was false." *Reeves*, 530 U.S. at 144. Walmart's 30(b)(6) corporate representative admitted that whether Plaintiff reported her wrist pain the first day it started is genuinely disputed. (SOF ¶241). This is because, according to Plaintiff, she reported the pain to Walmart during the same shift it appeared.

At approximately 1:00 AM on April 13, 2020, while working, Plaintiff began to feel wrist pain she had never felt before. (SOF ¶¶86-87). She reported the wrist pain to her direct supervisor before she left work that day. (SOF ¶¶91-92). Plaintiff's testimony genuinely disputes Walmart's reason for firing her. A jury could believe Plaintiff reported her wrist pain during the same shift in which it started and conclude Ammie Wilber denies the same because she is worried about losing her own job. (SOF ¶19b.i-ii). A jury could likewise disregard Walmart's self-proclaimed good faith understanding that Plaintiff violated policy.

**The Basis for Walmart's Self-Described "Good Faith" Belief is False**

"A plaintiff may not be forced to pursue any particular means of demonstrating that a defendant's stated reasons are pretextual." *Swackhammer*, 493 F.3d at 1168. Inconsistent statements and contradictions are admissible to challenge witness credibility. *U.S. v. Carter*, 973 F.3d 1509, 1512 (10th Cir. 1992); F.R.E. 607; 613; 801(d)(1)(A). Showing pretext is essentially an attack on an employer's credibility when it comes to the reason it took adverse actions against the plaintiff. Summary judgment cannot be granted where the employer's witnesses have been contradicted or impeached. *See Reeves*, 530 U.S. at 151.

Walmart argues that even if Plaintiff reported her wrist pain the day it started, summary judgment should be granted because the decision makers believed in "good faith" that she did not.

Part of the basis for this argument is Walmart's assertion that when David Whitenack asked Plaintiff to compete the Statement Form, he specifically asked her to include "when and to whom she reported" the injury to. (SOF ¶39). That assertion is genuinely disputed. (SOF ¶39a-e). Notably, the information Walmart says he requested is not in the Statement Form. *See Exhibit 14*. Plaintiff testified Whitenack only asked her to use the Statement Form to write about how she was feeling. (SOF ¶39b). Likewise, Whitenack did not initially testify that he asked Plaintiff to write down who she first reported the injury to or when she reported it. (SOF ¶39c). Even when questioned by Walmart's attorney, Whitenack did not say he gave these instructions to Plaintiff, he said that was his normal practice. (SOF ¶39e). The evidence suggests Whitenack did not follow his normal practice with Plaintiff.

Plaintiff's testimony is that Whitenack never asked her whether she previously reported her wrist pain. (SOF ¶117). It is reasonable to infer that if Whitenack truly wanted that information, he would have asked for it after Plaintiff did not include it on the Statement Form. Instead of asking follow-up questions, he fired her. (SOF ¶118). Whitenack testified the Statement Form was allegedly the basis for firing Plaintiff, but it does not contain any statement regarding whether Plaintiff previously reported the pain. *Exhibit 14*. For these reasons, a jury could disregard Walmart's argument that Whitenack believed Plaintiff violated company policy.

**Walmart Made No Effort to Confirm Its Purported Reason for Firing Plaintiff**

Walmart chose not to investigate when Plaintiff first reported her wrist pain even though it could have. (SOF ¶¶238-240). Contrary to Walmart's assertion in its Statement of Facts (SOF ¶39), Walmart's 30(b)(6) deposition witness admitted that Walmart never asked Plaintiff to provide a statement saying when, how, or to whom she had previously reported her wrist pain. (SOF ¶236). A reasonable jury could decide that if Walmart truly wanted to know when Plaintiff

first reported her workplace injury, it would have asked her or other employees, which it did not do. (SOF ¶237). Walmart's good faith argument is also undermined because Walmart wholly disregarded Plaintiff's workers' compensation rights after learning she was an injured worker.

**Walmart Disregarded its Own Mandatory Workplace Injury Policies**

Pretext can be found when an employer violates its own polices to take adverse action against the plaintiff. *See Plotke v. White*, 405 F.3d 1092, 1102 (10th Cir. 2005). "[I]nconsistencies and deviations from normal procedure … are sufficient to raise a genuine doubt about [the employer's] motivation. *Id.* at 1105. "[A]n employer's deviation from its own standard procedures may serve as evidence of pretext." *Hurlbert v. St. Mary's Health Care Sys., Inc.*, 439 F.3d 1286, 1299 (11th Cir. 2006); *accord Matson v. St. John Health System, Inc.*, 296 Fed.Appx 630, 635 (10th Cir. 2008) ("An employer's deviation from a binding company policy stated in an employee handbook can in certain circumstances be evidence of pretext.").

"The question is whether the jury could conclude that the procedural irregularities were somehow related to the decision-maker's discriminatory purpose." *Fassbender*, 890 F.3d at 889. Here, a jury could make such a conclusion because the mandatory policies Walmart disregarded directly apply to Plaintiff's workers' compensation rights. If the mandatory policies were followed, Plaintiff would have been offered medical treatment instead of being fired.

Walmart has a detailed policy manual that is mandatory and must be followed by human resources and management after they learn an employee is an injured worker. (SOF ¶¶125-126). Everyone involved in the situation with Plaintiff was aware of the Dot Com Safety Manual – except for Plaintiff. (SOF ¶¶129-132). Regardless, the policy is mandatory, not discretionary. (SOF ¶128). The Dot Com Safety Manual provides documents and instructions to management that must be used after learning an employee is injured. (SOF ¶139). Walmart admits that it should have

followed the mandatory Dot Com Safety Manual after it learned Plaintiff was an injured worker. (SOF ¶127; ¶¶140-141). The evidence shows it did not.

The Dot Com Safety Manual has several rules designed to make sure employees have access to their workers' compensation rights. It provides instructions about reporting an injury to the State (SOF ¶142), which was never done for Plaintiff (SOF ¶143) even though Walmart admits it was required based on information it had at its disposal. (SOF ¶147; ¶¶151-152). Quincy Usry says he never looked to see whether that needed to be done, even though that is his normal practice. (SOF ¶¶144-146). The Dot Com Manual also contains links to documents Walmart is supposed to provide to an injured worker to make sure she is informed of her rights, but Walmart failed to provide those documents to Plaintiff. (SOF ¶¶147-150).

The Dot Com Safety Manual also requires Walmart to provide an injured worker with a special form – the Associate Incident Report, which specifically requests information such as the cause of the injury, when it happened, and when and to whom it was first reported. (SOF ¶¶153-155; ¶¶159-161). Walmart claims it did not provide this form to Plaintiff (SOF ¶¶156-157). Interestingly, Plaintiff testified she was asked to fill out an Incident Report. (SOF ¶158). The Incident Report would have specifically asked Plaintiff if she wanted medical treatment. (SOF ¶162). According to Walmart, instead of using the required Associate Incident report, which asks for the pertinent information and informs the injured worker of their option to seek medical treatment, they used a Statement Form that was intended for witnesses and did not ask for any of the specific information Walmart claims it fired Plaintiff for failing to include in her statement. (SOF ¶¶163-164). Walmart's policy violations show Walmart was more concerned about firing Plaintiff than making sure she was healthy and afforded her workers' compensation rights.

Walmart failed to conduct an investigation into Plaintiff's injury report even though it was required. (SOF ¶¶165-172). Walmart's failure to investigate Plaintiff's injury undermines its argument that its reporting policy is designed to allow it to investigate injuries. Walmart not only failed to investigate Plaintiff's injury, it failed to properly document Plaintiff's injury report or to properly record her injury in its internal recording system. (SOF ¶¶175-178). Without creating the proper paper trail, perhaps Walmart could plausibly deny receiving notice of Plaintiff's injury if she did make a claim, which could cause a claim for compensation to be denied. *See Casco v. Armor Swift-Eckrich*, 154 P.3d 494, 519-20 (Kan. 2007) (discussing failure to notify could preclude compensation).

Walmart's actions suggest it did not want Plaintiff to exercise her workers' compensation rights beyond internally reporting her injury to Walmart. When Walmart learns that an employee has been injured, their mandatory policy informs management to provide the injured employee with three options – one of which includes seeking medical treatment, and none of which include being fired. (SOF ¶¶179-182). The Dot Com Safety Manual also required David Whitenack to have daily contact with Plaintiff for a week after finding out she was injured, but he never spoke to her again after he fired her. (SOF ¶¶173-174).

Walmart's Dot Com Safety Manual largely serves to ensure employee safety and compliance with workers' compensation laws and OSHA, and contains mandatory procedures that should have been followed. If Walmart were not motivated by a retaliatory motive designed to undermine the public policy of Kansas workers' compensation laws, it could have informed Plaintiff about her right to seek medical treatment, but it never did. (SOF ¶¶232-235). Walmart refused to offer Plaintiff medical treatment or inform her of her workers' compensation rights even though it knew she was in excruciating pain, had swelling, the pain was partially incapacitating

her job performance, she had taken medication for the pain, and the pain was getting worse.  (SOF ¶63b.iii); *see also Exhibit 14*. Walmart not only engaged in a pattern of behavior that violated its own mandatory policies, but those policy violations also prevented Plaintiff from exercising her workers' compensation rights. (SOF ¶63b.i-xii).

Instead of following the Dot Com Safety Manual's mandatory rules, Walmart exercised its discretion to fire Plaintiff thirty minutes after she submitted her written Statement Form about her injury. (SOF ¶118). Although the Dot Com Safety Manual allowed for Plaintiff to be disciplined, firing Plaintiff violated the mandatory Dot Com Safety Manual.

## Walmart Violated its Safety Violation Disciplinary Policies

A jury could find Walmart's explanation is pretext for retaliation because even though Walmart violated all the mandatory policies that applied to it, it issued Plaintiff discipline under a discretionary rule, and then violated policy by firing Plaintiff instead of issuing her a Step 1.

The mandatory Dot Com Safety Manual gives management discretion in deciding whether to issue discipline for safety violations, such as an employee who fails to report a known injury by the end of the shift. (SOF ¶¶183-185). Notably, an investigation is supposed to be completed first (SOF ¶188). Walmart admits it did not investigate Plaintiff's injury or when she reported it. Regardless, if discipline is issued, the Dot Com Safety Manual instructs management to use a certain form to issue the discipline – the Form 670e. (SOF ¶¶186-189). Using the Form 670e is required. (SOF ¶190). If the Form 670e was used, Plaintiff would not have been fired.

Walmart's 30(b)(6) witness admitted that according to the Form 670e, failing to report a known injury before the end of the shift results in a Step 1 violation. (SOF ¶191; ¶200). If an employee receives a Step 1 and then repeats the same behavior within the next 180 days, the employee receives a Step 3 or may be fired. (SOF ¶202). Walmart testified that this applies to "full

time associates." (SOF ¶203). Notably, Plaintiff was a full-time associate. (SOF ¶82; ¶¶204-205). Walmart fired Plaintiff instead of using the Form 670e as required by the Dot Com Safety Manual. (SOF ¶192). Walmart claims it relied on JetFlex Disciplinary guidelines, but those policies conflict with the Dot Com Safety Manual that Walmart admits specifically applies to workplace injuries. Moreover, all the managers involved in firing Plaintiff knew about their obligations under the Dot Com Safety Manual and had access to it. (SOF ¶¶127-132). A jury could conclude they ignored it to prevent Plaintiff from exercising her workers' compensation rights.

**<u>Walmart's Decision to Fire Plaintiff was Not Subjectively Reasonable</u>**

The jury could also find that Walmart's articulated basis for firing Plaintiff is illogical considering their policies and the circumstances surrounding Plaintiff's wrist pain and her job. A jury can disregard an employer's explanation for its own actions if the evidence undermines the subjective basis for the employer's actions. *See Fassbender*, 890 F.3d at 889. In other words, if there is not reasonable basis for the employer's stated reason for firing the plaintiff, the jury could find the employer is covering up an "ulterior motive." *Id.*

First, Walmart admits that it never provided Plaintiff any training about workplace injuries, when to report them, who to report them to, or the difference between injuries and routine soreness. (SOF ¶¶216-217; ¶¶224-225). The two documents that contain the rule Walmart says Plaintiff was fired for were provided to her before he employment began, but she received no training on them. Between the two documents, there are 308 bullet points, and only two of them relate to the rule Walmart claims Plaintiff violated. (SOF ¶214). Both documents suggest an employee must report a "known injury" during the shift in which the injury happens, but neither document explains what qualifies as an injury. (SOF ¶¶194-196; ¶¶199-201). Neither document explains the difference between soreness and injury. (SOF ¶¶218-219). Plaintiff was not provided any training on either

document or on what constitutes an injury versus what constitutes soreness. (SOF ¶¶216-217). This is material because Walmart's policies recognize the difference (SOF ¶206) and the Safety Employees recognize there is a difference. (SOF ¶¶207-208).

Unlike the policies accessible to Plaintiff, the Dot Com Safety Manual defines terms such as "injury" and "incident." (SOF ¶¶133-136). According to Walmart, an employee who is feeling sore from doing their normal job has not experienced an "injury incident." (SOF ¶137). Moreover, Walmart's policy contemplates that repetitive motion can cause pain, which may or may not result in an injury. (SOF ¶138). Given the nature of Plaintiff's job, the nature of her wrist pain, and Walmart's acknowledgment that repetitive motion can cause soreness, which is different than an "injury," a jury could find Walmart acted unreasonably. Plaintiff's job is physically demanding (SOF ¶81) and this was her first shift back from being quarantined for coronavirus symptoms. (SOF ¶¶83-85). No specific incident caused the pain. (SOF ¶88). It is reasonable to infer that she initially the pain she reported feeling did not qualify as an "injury incident" that even needed to be reported under Walmart's policy. Perhaps that is why Walmart actually denies Plaintiff suffered a workplace injury when she claims she started feeling pain on April 13, 2020. (SOF ¶242). Walmart's denial that Plaintiff suffered a workplace injury at 1:00 AM on April 13, 2020 brings us to Plaintiff's final pretext argument.

A jury could find it astonishing that Walmart claims it fired Plaintiff for reporting an April 13, 2020 workplace injury on April 14, 2020 while simultaneously denying Plaintiff suffered a workplace injury on April 13, 2020. (SOF ¶242). Given the totality of the circumstances, and drawing every reasonable inference in Plaintiff's favor, a jury could find that Walmart retaliated against Walmart by firing her. A jury will likely conclude Walmart was more concerned about firing Plaintiff than about actually finding out what happened, because it wanted to prevent her

from exercising her workers' compensation rights. If Walmart lacked an unlawful motive, it could have fired her and offered her medical treatment. But that is not what happened.

## CONCLUSION

Based on the foregoing, Plaintiff's claims of retaliatory discharge should proceed to a jury trial. Material facts set forth by Walmart are genuinely disputed. Moreover, Plaintiff has offered additional material facts which create questions of fact regarding Walmart's motive for firing Plaintiff. Accordingly, Defendant's *Motion for Summary Judgment* (Doc. 94) should be DENIED.

*Respectfully submitted by:*

**RALSTON KINNEY, LLC**

/s/ *Kenneth D. Kinney*
Kenneth D. Kinney, D.Kan. #78544
Thomas F. Ralston, D.Kan. #78212
4717 Grand Avenue, Suite 300
Kansas City, Missouri 64112
Tel: (816) 298-0086
Fax: (816) 298-9455
Email: ken@rklawllc.com
Email: tom@rklawllc.com
**ATTORNEYS FOR PLAINTIFF**

## CERTIFICATE OF SERVICE

I hereby certify that on July 9, 2021, a PDF copy of the foregoing was filed through the Court's ECF system, which will serve Defendant by emailing notice and a copy to Defendant's attorneys of record.

/s/ *Kenneth D. Kinney*
**ATTORNEY FOR PLAINTIFF**