## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

JANELL BRAXTON,

           Plaintiff,

v.

WALMART INC.,

           Defendant.

Case No. 20-2287-DDC-GEB

## <u>MEMORANDUM AND ORDER</u>

Plaintiff Janell Braxton used to work for defendant Walmart, Inc. at its eCommerce facility in Edgerton, Kansas. Plaintiff's employment began as a seasonal associate in March 2020. But on one of her first days on the job, she sustained an injury to her wrist. Walmart policy required associates to report a workplace injury to a supervisor during the same shift when the injury occurred. And while it's disputed whether plaintiff did so, Walmart—or, more appropriately, three decisionmakers at the Edgerton facility—believed she didn't. So, Walmart fired plaintiff, convinced that certain policies governing seasonal associates required her immediate termination.

Plaintiff brings this lawsuit against Walmart, claiming that Walmart fired her in retaliation for reporting a workplace injury, violating a well-established common law exception to at-will employment in Kansas. Plaintiff previously moved for summary judgment, and the court denied that motion. Now, taking a turn of its own, defendant Walmart has filed a Motion for Summary Judgment (Doc. 94), and a supporting brief (Doc. 95). Plaintiff has responded (Doc. 98) and Walmart has filed a Reply in turn (Doc. 101). So, Walmart's motion is now fully

briefed and ready for the court to decide.  The court grants Walmart's Motion for Summary

Judgment, for reasons explained below.

I.      **Background**

        A.      **Summary Judgment Facts**

        The following facts either have been stipulated by the parties in the Pretrial Order (Doc.

93), are uncontroverted, or, where controverted, are stated in the light most favorable to the

plaintiff, the party opposing summary judgment.  *Scott v. Harris*, 550 U.S. 372, 378 (2007).

                1.      **Plaintiff's Employment**

        Walmart hired plaintiff in March 2020 as a seasonal associate, on a temporary basis.

Doc. 95-2 at 3, 5–6 (Pl.'s Dep. 11:16–18, 26:23–27:20).  Plaintiff worked overnight shifts at an

eCommerce warehouse in Edgerton, Kansas, a facility associated with Jet.com, a distinct

company owned by Walmart.  *Id.* at 3, 8 (Pl.'s Dep. 11:16–12:8, 32:18–22); Doc. 95-3 at 4 (Usry

30(b)(6) Dep. 126:5–7).  Although plaintiff was a Jet.com seasonal associate (sometimes also

called a Jet seasonal associate in the summary judgment record),[1] plaintiff was still a Walmart

employee.  *See id.* (Usry 30(b)(6) Dep. 126:5–7).  So, Walmart's general policies applied to her,

but so did specific policies that applied to Jet seasonal associates.  *See* Doc. 98-6 at 8 (Whitenack

Dep. 40:15–25).

                2.      **Relevant Walmart Policies**

        Walmart maintains two policies that are relevant to this case.  The first—"Policy 763e"

or the "General Safe Work Practices"—reads:  "All known injuries, no matter how slight, will be

---

[1]      The summary judgment record also contains references to JetFlex seasonal associates.  *See, e.g.*,
Doc. 95-19 at 1.  Although the difference between a Jet or JetFlex seasonal associate isn't clear, the
record doesn't indicate that there is any meaningful difference between the two titles.  And Walmart has
acknowledged that policies applying to JetFlex seasonal associates applied to plaintiff during her
employment.  *See* Doc. 98-6 at 8 (Whitenack Dep. 40:15–25); *see also infra* n.3.

reported to a member of management immediately.  At a minimum, these must be reported to a member of management by the end of the shift."  Doc. 95-10 at 1.  Any associate who violates this policy receives a written discipline.  *See* Doc. 95-9 (Walmart Safety & Compliance Rule Violation Form 670e, noting that "Failure to report any known injury before the end of shift" is a "Step 1" violation).  The second policy, called the "Conduct Disciplinary Action Guidelines," provides that "Jetflex and Jet Seasonal [associates] should be terminated when their coaching has progressed to a formal written[.]"[2]  Doc. 95-19 at 1; Doc. 95-6 at 6 (Medaris Dep. 79:1–14) (authenticating Conduct Disciplinary Action Guidelines).[3]

Walmart also has a general and comprehensive "Dot Com Safety" policy for incident investigation and reporting.  *See generally* Doc. 98-11.  Like policy 763e, the Dot Com Safety policy required associates involved in an incident to report the incident to their manager immediately.  *Id.* at 4.  The Dot Com Safety policy defines an "incident" as any "unexpected, unplanned, or abnormal event or series of events that occurs and does result in an injury."  *Id.* at 2 (emphasis omitted).  Failure to report an incident to management "may result in disciplinary action[.]"  *Id.* at 4.  In that situation, the Dot Com Safety policy directs managers to the "WMW-670e eCommerce Safety and Compliance Rule Violation form[.]"  *Id.* at 4, 5; *see also* Doc. 95-9 at 1 (Form 670e).  Form 670e is a template form that managers use to tell associates when they

---

[2]    Mr. Whitenack, Ms. Medaris, and Mr. Usry all testified or declared that the phrase "formal written" or "written coaching" refers to a "Step 1 violation."  Doc. 98-6 at 8 (Whitenack Dep. 38:18–39:10); Doc. 95-5 at 7 (Whitenack Dep. 20:21–24); Doc. 98-4 at 26 (Usry 30(b)(6) Dep. 108:13–18); Doc. 95-13 at 2 (Medaris Decl. ¶¶ 6–8).

[3]    Walmart also maintained "JetFlex Disciplinary Action Guidelines" that applied to plaintiff during her employment.  Doc. 98-10 at 2; Doc. 98-6 at 8 (Whitenack Dep. 40:15–25).  The JetFlex Disciplinary Guidelines provide that a "minimum of two Quick Coach conversations should occur before releasing a JetFlex associate for performance or conduct[.]"  Doc. 98-10 at 2.  But, like the Conduct Disciplinary Action Guidelines, the JetFlex Disciplinary Guidelines also provide that if "the associate's conduct is severe enough for a written coaching, the JetFlex associate should be released immediately[.]"  *Id.*  The two guidelines are thus consistent with each other.

have committed a safety violation.[4]  Doc. 98-4 at 14 (Usry 30(b)(6) Dep. 50:5–8).  Form 670e

lists "Failure to report any known injury before the end of the shift" as a "Step 1" violation.

Doc. 95-9 at 1.  Form 670e also specifies that any "repeat of the same violation within 180

calendar days" potentially could result in termination.  *Id.*

The Dot Com Safety policy also requires that, if an injury has occurred, management

should perform a variety of tasks—those tasks are discussed in more detail below.  Walmart

required all employees (associates and management) at the Edgerton facility to follow the Dot

Com Safety policy.  Doc. 98-4 at 16 (Usry 30(b)(6) Dep. 68:10–17).

Finally, during plaintiff's employment, Walmart maintained a "Discrimination &

Harassment Prevention Policy."  Doc. 98-19; Doc. 98-4 at 7 (Usry 30(b)(6) Dep. 18:5–17).  The

policy prohibits discrimination directed at associates, and explicitly prohibits firing an associate

based on a legally protected status.  Doc. 98-19 at 2; Doc. 98-4 at 7–8 (Usry 30(b)(6) Dep. 18:5–

22:7).  As Walmart understood, its policy recognized that reporting a workplace injury qualifies

as a legally protected status.  Doc. 98-4 at 8 (Usry 30(b)(6) Dep. 22:12–24).

So, to review, Walmart Policy 763e required all employees to report a known injury to a

manager or supervisor immediately or, at least, by the end of the shift when the injury had

occurred.  Failure to do so triggered a "Step 1" written violation, as specified in the Dot Com

Safety policy and Form 670e.  But the Conduct Disciplinary Action Guidelines provided that

---

[4]     Plaintiff argues that the Edgerton facility "does not even use Form 670e."  Doc. 98 at 24.  For
support, she cites testimony from Chelsea Davidson, Senior Manager of Human Resources for
defendant's Edgerton facility.  But plaintiff's argument misrepresents Ms. Davidson's testimony.  Ms.
Davidson testified that Human Resources does not use Form 670e for "coaching" but did not know if
safety employees used the form.  Doc. 98-8 at 6–7 (Davidson Dep. 43:3–45:2).  Plaintiff acknowledges,
and the summary judgment record confirms, that the Dot Com Safety policy applied to all associates at
the Edgerton facility, and the Dot Com Safety policy mandated the use of Form 670e.  Doc. 98-11 at 5.

managers "should terminate" any JetFlex or Jet Seasonal associates who received a "Step 1" written violation.

### 3.    Plaintiff's Injury and Termination

Plaintiff worked three consecutive, overnight shifts from April 12, 2020, through April 15, 2020.  Doc. 95-2 at 11 (Pl.'s Dep. 39:4–12).  During her April 12–13 shift, at about 1:00 AM, plaintiff began to feel a "throbbing pain" in her left wrist.  *Id.* at 13 (Pl.'s Dep. 48:12–23).  The pain worsened over the course of plaintiff's shift.  *Id.* at 14 (Pl.'s Dep. 51:1–5).  At the end of her shift, around 5:00 AM on April 13, plaintiff's direct supervisor, Ammie Wilbur, came over to plaintiff's workstation and told plaintiff she was "doing better than anyone on the team at that time."  *Id.* (Pl.'s Dep. 51:16–21).  Plaintiff responded that she didn't "know how that's possible because [her] wrist [was] really hurting" her.  *Id.* (Pl.'s Dep. 51:22–23).  Plaintiff didn't elaborate.  *Id.* at 15 (Pl.'s Dep. 53:1–4).  The Edgerton facility maintained a "safety cubicle" staffed by safety personnel to assist associates.  *Id.* at 9 (Pl.'s Dep. 34:1–25).  Walmart instructed associates to go to the safety cubicle whenever they needed medical attention.  *Id.* at 10 (Pl.'s Dep. 36:18–25).  But plaintiff finished work without visiting the safety cubicle.  *Id.* at 15 (Pl.'s Dep. 53:12–24).  And Ms. Wilbur doesn't remember plaintiff reporting any wrist pain to her at the end of the April 12–13 shift.  Doc. 95-4 at 2, 3 (Wilbur Dep. 16:4–7, 18:15–17).

When plaintiff arrived for her next shift on April 13, her wrist still was bothering her.  Doc. 95-2 at 17, 18 (Pl.'s Dep. 57:14–18, 58:21–24).  At the beginning of her April 13–14 shift, plaintiff told a manager that her wrist hurt.  *Id.* at 19 (Pl.'s Dep. 61:12–20).  And her wrist continued to hurt during her shift.  *Id.* at 21 (Pl.'s Dep. 65:7–10).  Plaintiff didn't visit the safety cubicle during this shift.  *Id.* at 20 (Pl.'s Dep. 64:22–65:2).

On April 14, plaintiff reported for her April 14–15 shift.  *Id.* at 24 (Pl.'s Dep. 68:12–22).

Two or two and a half hours into her shift, plaintiff approached Ms. Wilbur about her wrist pain.

*Id.* at 25 (Pl.'s Dep. 72:4–17).  Plaintiff's wrist still was bothering her, and she requested a brace

or wrap.  *Id.* at 26, 27 (Pl.'s Dep. 73:2–7, 75:15–19).  Ms. Wilbur told plaintiff to go to the safety

cubicle, where Safety Lead Mark Tuazon provided plaintiff with an ointment.  *Id.* at 26, 28–29

(Pl.'s Dep. 73:8–10, 77:25–78:11); Doc. 98-18 at 4, 6 (Tuazon Dep. 6:4–8, 18:17–19:11).

Walmart's Dot Com Safety policy required Mr. Tuazon to create an incident report when an

associate reported an injury, but Mr. Tuazon didn't file any kind of report about plaintiff's injury.

Doc. 98-18 at 5, 6–7 (Tuazon Dep. 9:14–22, 11:1–9, 20:18–21:18).  Plaintiff then returned to

work.  Doc. 95-2 at 31 (Pl.'s Dep. 83:1–5).

About an hour and a half later, Ms. Wilbur approached plaintiff and asked if she had

sustained her wrist injury at work.  *Id.* at 31–32 (Pl.'s Dep. 83:24–84:13).  Plaintiff said she had.

*Id.*  Ms. Wilbur then reported this to David Whitenack,[5] the Operations Manager.  Doc. 95-5 at 3,

10 (Whitenack Dep. 8:19–22, 79:2–7).  Mr. Whitenack came to plaintiff's workstation and asked

her if her wrist injury had occurred at work, and plaintiff said yes.  Doc. 95-2 at 33 (Pl.'s Dep.

86:20–23).  Mr. Whitenack told her to log off so she could file an incident report.  *Id.* at 33 (Pl.'s

Dep. 86:1–8).

Walmart's Dot Com policy requires that, when an injury occurs, human resources or

management "will have the associate complete, sign, and date . . . the Associate Incident

Report."  Doc. 98-4 at 21–22 (Usry 30(b)(6) Dep. 88:12–89:14); *see also* Doc. 98-11 at 4 (Dot

Com Safety Policy).  This mandatory Associate Incident Report includes places for the associate

to describe the incident, provide the date and time when the associate reported the incident, and

---

[5]      At her deposition, plaintiff didn't know Mr. Whitenack's name and referred to him throughout
her testimony as "male manager."

name the manager to whom the associate reported the incident. Doc. 98-15 at 2 (Associate

Incident Report Form). But when plaintiff and Mr. Whitenack went to the safety cubicle, Mr.

Whitenack didn't give plaintiff the Associate Incident Report. *See* Doc. 98-4 at 22 (Usry

30(b)(6) Dep. 90:12–91:13); Doc. 95-2 at 37 (Pl.'s Dep. 90:19–24). Instead, he provided a blank

"Statement Form." Doc. 95-2 at 37 (Pl.'s Dep. 90:19–24). Mr. Whitenack told plaintiff to

complete the form and "write down everything that [she] was feeling, that was going on with

[her] wrist." Doc. 95-2 at 37–38 (Pl.'s Dep. 90:24–91:1).

> On the "Statement Form," dated April 14, 2020, plaintiff wrote:

> On Monday morning [April 13,] I noticed that my wrist began to ache. It progressed to throbbing pain and by the time I left at 5:00 am it was excruciating. I took a 500mg tylenol & went to sleep. It is swollen & sometimes feels warm to the touch. There is a little bruising. It is hard for me to work fast when putting items in the mailers & it hurts to pick up semi heavy items with that wrist. I can only pick up the totes if they are partially full. It is my left wrist that is injured. I am trying not to use it. The pain progresses throughout the shift.

Doc. 98-14 at 2 (Statement Form); Doc. 95-2 at 39 (Pl.'s Dep. 92:10–23) (authenticating the

Statement Form). In her statement, plaintiff doesn't mention reporting her wrist injury to Ms.

Wilbur at the end of her April 13 shift. *See generally* Doc. 98-14 at 2 (Statement Form). The

parties dispute whether plaintiff and Mr. Whitenack talked about plaintiff previously reporting

her injury. Plaintiff claims Mr. Whitenack didn't ask her whether she had previously reported

her injury. Doc. 98-2 at 18 (Pl.'s Dep. 87:18–21). Mr. Whitenack claims he always instructed

associates filling out a safety form to include when the injury occurred and if they reported the

injury to anyone. Doc. 95-5 at 10–11 (Whitenack Dep. 79:24–80:3). But it's undisputed that

plaintiff, in her statement form, didn't mention reporting her wrist injury to Ms. Wilbur at the

end of her April 13 shift.

Sometime after talking with plaintiff, Mr. Whitenack texted Quincy Usry, an Environmental Health and Safety Operations Manager. Doc. 98-6 at 9 (Whitenack Dep. 44:13–16); Doc. 95-11 (text message exchange). He told Mr. Usry that plaintiff "said she hurt her wrist Sunday (doesn't know how) and didn't tell anyone[.]" Doc. 95-11 at 1. Mr. Usry responded: "Hurt how?  Can she write a statement.  She only get coached if she describes pain." *Id.* Mr. Whitenack responded that he'd have plaintiff write a statement. *Id.* at 1. Then, Mr. Whitenack asked, "How long do they have to report?  EOS [End of shift]?" *Id.* at 1. Mr. Usry said that he "want[ed] to see the statement first," but he didn't otherwise respond directly to Mr. Whitenack's question. *See id.* at 1–2. Mr. Whitenack then sent a picture of plaintiff's statement to Mr. Usry. *Id.* at 2. Mr. Usry responded:  "Yea, that would be a coaching.  Is HR on site?  Would she be termed with a written coaching?" *Id.* at 2. Mr. Whitenack replied, "Let me ask[.]" *Id.* The record of the text conversation stops there. But Mr. Whitenack testified that he provided plaintiff's written statement to Morgan Medaris, a Human Resources Coordinator at the Edgerton facility. Doc. 95-5 at 6 (Whitenack Dep. 15:5–18). And Ms. Medaris testified that she read the statement. Doc. 95-6 at 3 (Medaris Dep. 19:2); *see also* Doc. 95-13 at 1–2 (Medaris Decl. ¶ 5) ("Whitenack . . . informed me that [plaintiff] had injured her wrist during her April 12–13, 2020 overnight shift . . . [but] first reported her injury to Walmart during her April 14–15, 2020 overnight shift.").

Mr. Whitenack then took plaintiff to the human resources office. Doc. 95-2 at 41–42 (Pl.'s Dep. 104:24–105:8). There, plaintiff met with Mr. Whitenack and Ms. Medaris. *Id.* at 42 (Pl.'s Dep. 105:7–9). Mr. Whitenack told plaintiff that she was "supposed to report [her] work injury . . . within 24 hours[.]" *Id.* (Pl.'s Dep. 105:13–15). It's undisputed that, at this point, plaintiff didn't tell Mr. Whitenack or Ms. Medaris that she had reported her injury to Ms. Wilbur

at the end of her April 12–13 shift.  *Id.* at 42–43 (Pl.'s Dep. 108:12–109:1).  Mr. Whitenack

continued, explaining that plaintiff was a temporary employee and, as a result, neither he nor Ms.

Medaris was required to give plaintiff any warnings, and they could fire plaintiff without written

warnings.  *Id.* at 42 (Pl.'s Dep. 105:15–18).  According to plaintiff, Mr. Whitenack told her "they

wanted to protect themselves and that they hoped that [plaintiff] could understand."  *Id.* (Pl.'s

Dep. 105:18–20).  Walmart then terminated plaintiff's employment on April 14, 2020, before

11:32 PM, a few hours after she had reported her injury to Ms. Wilbur during that shift.  Doc. 93

at 3 (Pretrial Order ¶ 10).

Shortly after plaintiff was terminated, she texted a fellow associate, "I just got fired for

not reporting my wrist on the night it started hurting."  Doc. 95-14 at 1.  And around the same

time, Ms. Medaris e-mailed Mr. Usry:  "We have completed [plaintiff's] termination for late

reporting."  Doc. 95-15.  In her email, Ms. Medaris expressed concern that Walmart's "safety

school" training overlooked "the compliance portion of safety" because new associates weren't

told when to report an injury.  *Id.*  In response to Ms. Medaris's concern, Walmart posted the

670e form in "safety school[.]"  Doc. 95-7 at 3–4 (Usry 30(b)(6) Dep. 61:20–62:6).

Mr. Whitenack and Ms. Medaris jointly agreed to terminate plaintiff's employment, with

advice from Mr. Usry.  Doc. 95-6 at 5 (Medaris Dep. 23:5–9); Doc. 98-6 at 19 (Whitenack Dep.

97:4–8); Doc. 98-12 at 10 (Usry 30(b)(6) Dep. 120:15–19).  Mr. Whitenack testified that, at the

time he fired plaintiff, he didn't know that plaintiff had reported her injury to Ms. Wilbur at the

end of her April 12–13 shift.  Doc. 95-5 at 8 (Whitenack Dep. 77:13–20).  He testified that, at the

time he decided to fire plaintiff, he "was under the impression that she was reporting an injury

late[.]"  *Id.* at 5 (Whitenack Dep. 14:13–14).  Mr. Whitenack also testified that, if plaintiff had

not reported her injury, he wouldn't have terminated her—but he specified that he terminated

plaintiff "for failure to report an injury by the end of shift."  Doc. 98-6 at 15 (Whitenack Dep. 74:10–75:22).  Mr. Whitenack testified that he relied on two documents when deciding to fire plaintiff:  (1) Form 670e, which, as described above, specified that failing to report an injury by the end of the shift in which it occurred was a "Step 1" violation, Doc. 95-9; and (2) the Conduct Disciplinary Action Guidelines, which provided that "Jetflex and Jet Seasonal [associates] should be terminated when their coaching has progressed to a formal written[,]"  Doc. 95-19; Doc. 95-5 at 7 (Whitenack Dep. 20:3–19).

Ms. Medaris similarly testified that she terminated plaintiff's employment "based on her statement that she reported late."  Doc. 98-13 at 4 (Medaris Dep. 17:7–11).  She considered plaintiff's failure to report an injury in a timely fashion to require a "first written" discipline. Doc. 95-6 at 6 (Medaris Dep. 79:15–18).  And, under the Conduct Disciplinary Action Guidelines, this "first written" discipline required her to terminate plaintiff's employment.  *Id.* (Medaris Dep. 79:1–14); *see also* Doc. 95-13 at 2 (Medaris Decl. ¶ 8) ("Based upon my conclusion that [plaintiff's] violation of Policy 670e warranted a First Written disciplinary action, and because [she] was a Jet Seasonal associate, I concluded that [her] employment was to be terminated pursuant to Policy 670e and Walmart's Conduct Disciplinary Action Guidelines.").  But, like Mr. Whitenack, Ms. Medaris conceded that without knowledge of plaintiff's injury, she wouldn't have fired her.  Doc. 98-13 at 4 (Medaris Dep. 20:9–15).

Mr. Usry, as Walmart's Rule 30(b)(6) corporate representative, likewise testified that Walmart terminated plaintiff's employment for failing to report her injury in a timely manner. *See* Doc. 98-12 at 10 (Usry 30(b)(6) Dep. 120:15–19); *see also id.* at 8 (Usry 30(b)(6) Dep. 45:19–23).  But Mr. Usry—again as Walmart's corporate representative—also acknowledged

that if plaintiff hadn't reported her injury, Walmart wouldn't have fired her. *Id.* at 9 (Usry 30(b)(6) Dep. 55:18–56:2).

### 4.     Walmart's Failure to Follow the Dot Com Safety Policy

Under Walmart's Dot Com Safety policy, Walmart should've taken several actions after learning of plaintiff's workplace injury. Specifically, under the policy, Walmart should have:

- provided plaintiff with an "Associate Incident Report," with specific questions about when plaintiff reported her injury and to whom;

- completed a "First Report of Injury Form" if required by the State of Kansas;

- recorded the incident in Walmart's "Incident Reporting System" within 24 hours of the incident;

- completed a "Safety Incident Investigation" form and followed an 8-step review and investigation process;

- Followed up with plaintiff for seven days after her injury.

Doc. 98-11 at 4–7. It's undisputed that Walmart didn't do any of those things. *See* Doc. 98-4 at 21, 22, 23, 24–25, 29 (Usry 30(b)(6) Dep. 86:14–87:23, 90:12–24, 94:11–20, 97:15–25, 99:9–17, 99:18–100:15, 100:24–102:2, 117:6–8); Doc. 98-6 at 4–5, 20 (Whitenack Dep. 16:25–17:2, 103:11–13).

The State of Kansas requires employers to provide injured workers with "Information for Injured Employees," a document explaining what to do if an injury occurs on the job. Doc. 98-17 at 2. Walmart didn't give plaintiff this document, though it knew she was an injured worker. Doc. 98-4 at 29 (Usry 30(b)(6) Dep. 117:19–118:17). The State of Kansas also requires Walmart to report plaintiff's injury within 28 days. *Id.* (Usry 30(b)(6) Dep. 118:23–119:19). Walmart didn't do that either. *Id.* (Usry 30(b)(6) Dep. 119:20–120:3).

### B.      Procedural History

Plaintiff brings this lawsuit against Walmart for retaliatory discharge under Kansas common law.  At base, she argues that Walmart fired her for reporting a workplace injury, violating Kansas public policy.  Earlier in this litigation, plaintiff filed a Motion for Partial Summary Judgment (Doc. 47).  The court denied that motion in a Memorandum and Order dated May 18, 2021.  *See generally* Doc. 87.  Because the court's Order deciding that earlier motion is relevant to the motion currently before the court, the court will briefly summarize it.

In the May 18 Order, the court first rejected plaintiff's argument that she had direct evidence of retaliation.  *See* Doc. 87 at 9–13.  Plaintiff pointed to the following few lines of deposition testimony from Mr. Usry:

> Q.  So but for Ms. Braxton's report of a workplace injury to Walmart,
>      Walmart would not have terminated her as it did, correct?
>
> A.  Correct.

*Id.* at 9 (quoting Doc. 48-2 at 13–14 (Usry 30(b)(6) Dep. 55:24–56:2)).

But, after reviewing the testimony as a whole, the court concluded that Mr. Usry repeatedly testified that Walmart "terminated plaintiff because she failed to report her workplace injury in a timely fashion," violating Walmart policy.  *Id.* at 13.  The court found that Mr. Usry repeatedly emphasized the untimeliness of plaintiff's report as the reason for her termination, and that his failure to emphasize timeliness "just once" in his deposition testimony wasn't sufficient to establish direct evidence of retaliation.  *Id.*

Next, the court applied the familiar *McDonnell-Douglas* burden-shifting framework to determine whether plaintiff had adduced circumstantial evidence of retaliation.  The court first assumed that plaintiff had established her prima facie case.  *Id.* at 15–16.  The court then accepted Walmart's offer of a legitimate, nonretaliatory reason for terminating plaintiff:  she

violated Walmart's policy requiring employees to report workplace injuries during the shift in which they occur. *Id.* at 16. In doing so, the court rejected plaintiff's argument that Walmart's policy violated the public policy of Kansas that makes it "illegal to fire an employee for sustaining a workplace injury." *Id.* at 17. As support for her argument, plaintiff relied on Kan. Stat. Ann. § 44-520(a)(1)(A). It provides employees in Kansas 20 days from the date of injury to report a claim for workers' compensation. Kan. Stat. Ann. § 44-520(a)(1)(A). Plaintiff argued that Walmart's immediate reporting rule undermined this public policy. Doc. 87 at 17. But the court rejected this argument, concluding that plaintiff "misconstrue[d]" the statute. *Id.* The court reasoned that the statute did "not forbid employers from adopting . . . workplace policies requiring their employees to report workplace injuries on a prompter basis" *i.e.*, sooner than 20 days from the date of injury. *Id.* Thus, the court found that Walmart had come forward "with a legitimate, nonretaliatory reason for terminating plaintiff's employment." *Id.* And finally, because plaintiff didn't make any argument that Walmart's non-retaliatory reason was pretextual, the court denied plaintiff's Motion for Partial Summary Judgment. *Id.* at 18.

## II.     Legal Standard

Summary judgment is appropriate if the moving party demonstrates "no genuine dispute" exists about "any material fact" and that it is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). When the court applies this standard, it views the evidence and draws reasonable inferences in the light most favorable to the non-moving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007). But the court "need not make unreasonable inferences or adopt one party's version of the facts if the record doesn't support it." *Harte v. Bd. of Comm'rs of Cnty. of Johnson, Kan.*, 864 F.3d 1154, 1173 (10th Cir. 2017). An issue of "material fact is 'genuine' . . . if the evidence is such that a

reasonable jury could return a verdict for the nonmoving party" on the issue. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). And, an issue of fact is "material" if it has the ability to "affect the outcome of the suit under the governing law[.]" *Id.*

The party moving for summary judgment bears the initial burden of showing "the basis for its motion[.]" *Celotex Corp.*, 477 U.S. at 323; *Kannady v. City of Kiowa*, 590 F.3d 1161, 1169 (10th Cir. 2010) (explaining that the moving party bears "'both the initial burden of production on a motion for summary judgment and the burden of establishing that summary judgment is appropriate as a matter of law'" (quoting *Trainor v. Apollo Metal Specialties, Inc.*, 318 F.3d 976, 979 (10th Cir. 2002))). A summary judgment movant can satisfy this burden by demonstrating "that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp.*, 477 U.S. at 325; *see also Kannady*, 590 F.3d at 1169 (explaining that, to meet its summary judgment burden, the moving party "need not negate the non-movant's claim, but need only point to an absence of evidence to support the non-movant's claim" (quotation cleaned up)).

If the moving party satisfies its initial burden, the non-moving party "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 250 (quotation cleaned up); *see also Kannady*, 590 F.3d at 1169 ("If the movant carries [the] initial burden, the nonmovant may not rest on its pleadings, but must bring forward specific facts showing a genuine issue for trial [on] those dispositive matters for which it carries the burden of proof." (quotation cleaned up)). To satisfy this requirement, the nonmoving party must "go beyond the pleadings and by [its] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Celotex Corp.*, 477 U.S. at 324 (quotation cleaned up). When deciding whether the parties have shouldered their summary judgment burdens, "the judge's function is not . . . to

weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.

Summary judgment is not a "disfavored procedural shortcut[.]" *Celotex Corp.*, 477 U.S. at 327. Instead, summary judgment is an important procedure "designed 'to secure the just, speedy, and inexpensive determination of every action.'" *Id.* (quoting Fed. R. Civ. P. 1 (further citation omitted)).

## III.    Analysis

Plaintiff claims that Walmart retaliated against her for reporting a workplace injury, violating Kansas law.[6] "Kansas follows the common-law employment-at-will doctrine, which allows employers to terminate employees for good cause, for no cause, or even for the wrong cause." *Goodman v. Wesley Med. Ctr., LLC*, 78 P.3d 817, 821 (Kan. 2003). So, to prevail on a retaliatory discharge claim, "an employee must demonstrate that he or she falls within one of the exceptions to the employment-at-will doctrine." *Id.* One such exception applies "where an employer discharges an employee in retaliation" for exercising his or her rights under the Kansas Workers' Compensation Act. *Sanjuan v. IBP, Inc.*, 160 F.3d 1291, 1298 (10th Cir. 1998).

Plaintiff's claim for retaliatory discharge under Kansas law follows the familiar analytical framework applied to a Title VII claim. *Foster v. Alliedsignal, Inc.*, 293 F.3d 1187, 1193 (10th

---

[6]    Plaintiff is a resident and citizen of Missouri. Doc. 20 at 1 (First Am. Compl. ¶ 4). Walmart is incorporated in Delaware and its principal place of business is in Arkansas. *Id.* at 2 (First Am. Compl. ¶¶ 8–9). So, there is complete diversity between the parties. And the court previously concluded that plaintiff sufficiently established that the amount in controversy in this case exceeds $75,000. Doc. 86. The court thus has diversity jurisdiction under 28 U.S.C. § 1332.

In a diversity case, the court applies the law of the forum state. Here, that's Kansas. And for tort claims like plaintiff's retaliatory discharge claim, Kansas applies the law of the state where the tort occurred. *Brown v. Kleen Kut Mfg. Co.*, 714 P.2d 942, 944 (Kan. 1986); *see also Atchison Casting Corp. v. Dofasco, Inc.*, 889 F. Supp. 1445, 1456 (D. Kan. 1995). Walmart fired plaintiff in Kansas. So, Kansas law applies.

Cir. 2002) ("Kansas courts have adopted the *McDonnell Douglas* burden-shifting framework for analyzing retaliatory discharge cases." (footnote omitted)).  That is, plaintiff can either (1) adduce direct evidence of retaliation, or (2) establish circumstantial evidence of retaliation, through the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *Lounds v. Lincare, Inc.*, 812 F.3d 1208, 1233 (10th Cir. 2015).  Although "evidence of retaliatory intent is frequently circumstantial in nature," *Hysten v. Burlington Northern Santa Fe Railway Co.*, 530 F.3d 1260, 1268 (10th Cir. 2008), plaintiff argues that she has adduced both direct and circumstantial evidence of retaliatory intent.  The court considers both arguments below, in turn.

### A.    Direct Evidence

Plaintiff first argues that she has direct evidence of Walmart's retaliatory intent.  This argument essentially is a do-over of an argument the court already rejected when ruling plaintiff's Motion for Partial Summary Judgment.

"'Direct evidence is evidence, which if believed, proves the existence of a fact in issue without inference or presumption.'"  *Riggs v. AirTran Airways, Inc.*, 497 F.3d 1108, 1117 (10th Cir. 2007) (quoting *Hall v. U.S. Dep't of Labor*, 476 F.3d 847, 855 (10th Cir. 2007)).  Necessarily then, "evidence is not 'direct' if an inference of discrimination is required."  *Id.* at 1118; *see also Hall*, 476 F.3d at 855 ("A statement that can plausibly be interpreted two different ways—one discriminatory and the other benign—does not directly reflect illegal animus, and, thus, does not constitute direct evidence." (quotation cleaned up)).

Plaintiff highlights three snippets of testimony from the depositions of the three decisionmakers who fired her—Mr. Whitenack, Ms. Medaris, and Mr. Usry.  She claims all three testified that they wouldn't have fired her "if she did not report her workplace injury."  Doc. 98 at 46.  Plaintiff's right.  All three testified to that fact in their depositions:

Q.  So if [plaintiff] would have never told you that she had been hurt at work, would you personally have had a reason to fire [her] on April 14th, 2020?

…

MR. WHITENACK:  Correct.

Doc. 98-6 at 15 (Whitenack Dep. 74:21–75:1).

Q.  Without the knowledge of [plaintiff's] injury report, Walmart wouldn't have fired her, correct?

…

MS. MEDARIS:  In relation to the reason that she was terminated, no, we would not.

Doc. 98-13 at 4 (Medaris Dep. 20:9–15).

Q. So but for [plaintiff's] report of a workplace injury to Walmart, Walmart would not have terminated her as it did, correct?

MR. USRY:  Correct.

Doc. 98-12 at 9 (Usry 30(b)(6) Dep. 55:24–56:2).

But plaintiff's argument inaccurately excerpts these three statements in a fashion that robs them of their context.  All three decisionmakers clarified and emphasized throughout their depositions that the reason they decided to fire plaintiff was that she didn't *timely* report her injury.  Just a few lines after plaintiff's cited testimony from Mr. Whitenack, he testified that he "terminated [plaintiff's] employment for failure to report an injury by the end of shift."  Doc. 98-6 at 15 (Whitenack Dep. 75:21–22).  Likewise, a few lines before plaintiff's cited testimony from Ms. Medaris, Ms. Medaris testified that she terminated plaintiff "based on her statement that she reported late."  Doc. 98-13 at 4 (Medaris Dep. 17:7–11); *see also* Doc. 95-6 at 4 (Medaris Dep. 21:14–16) ("[Plaintiff] was actually terminated for violating our policy regarding late reporting, not regarding the injury itself.").  And yet again, in earlier parts of Mr. Usry's Rule 30(b)(6) testimony, he reiterated that Walmart fired plaintiff because of her untimely report.  Doc. 98-12

at 8 (Usry 30(b)(6) Dep. 45:4–8) ("Q.  And Walmart's contention is that had [plaintiff] actually reported her injury on April 13th of 2020, it would not have fired her; is that correct?  A.  If she would have reported it by end of shift, correct."); *id.* (Usry 30(b)(6) Dep. 45:19–23) ("Q. Walmart's contention or position in this lawsuit is that it would not have fired her had she reported her workplace injury in the shift she first noticed it, correct?  A.  Correct.").

The court's previous Order already has concluded that plaintiff's argument took Mr. Usry's deposition testimony out of context.  Her arguments now about Mr. Whitenack's and Ms. Medaris's testimony are cut from the same cloth.  Thus, the court again rejects plaintiff's direct evidence argument.

To be sure, the court recognizes the conceptual difficulty with this case.  If plaintiff hadn't reported her injury at all, she wouldn't have failed to report her injury in a timely fashion. The decisionmakers recognized this in their testimony.  *See* Doc. 98-6 at 15 (Whitenack Dep. 74:16–19) ("Without [plaintiff] informing us that there would have been an injury, there would have been no way to know that one occurred, so we wouldn't have been able to terminate her[.]"); Doc. 95-6 at 4 (Medaris Dep. 21:23–24) ("Had [plaintiff] not reported [her injury], we would have never known an injury would have occurred."); Doc. 98-12 at 9 (Usry 30(b)(6) Dep. 55:3–7) ("Q.  And there is a connection between [plaintiff's] report of a workplace injury and her termination that same day? . . . A.  Simplistically, yes.").  And Walmart acknowledges as much in its briefing.  *See* Doc. 101 at 19 ("At base, Plaintiff argues that an employer has retaliated against an employee by holding him or her accountable for violating a timely reporting rule because it has necessarily acted on knowledge of that employee's injury[.]").

But plaintiff can't properly adduce direct evidence by exploiting the conceptual similarity linking reporting and timely reporting, and then cherry-picking favorable words in the testimony

while ignoring unfavorable words. After all, a witness's statement, when read in context, "that can plausibly be interpreted two different ways—one discriminatory and the other benign—does not directly reflect illegal animus, and, thus, does not constitute direct evidence." *Hall*, 476 F.3d at 855. *Hall*'s principle applies directly to this case. When stripped of context, the decisionmakers' testimony looks like direct evidence of retaliatory intent. But, when read in context, the statements don't reflect retaliatory animus. Thus, plaintiff's cited testimony doesn't amount to direct evidence of retaliation.

### B.      Circumstantial Evidence

Having concluded that plaintiff hasn't adduced direct evidence of retaliatory intent, the court now turns to plaintiff's offer of circumstantial evidence under *McDonnell Douglas*. As discussed before, "Kansas applies the familiar *McDonnell Douglas* burden-shifting framework for analyzing retaliatory discharge claims." *Hysten v. Burlington N. Santa Fe Ry. Co.*, 530 F.3d 1260, 1268 (10th Cir. 2008) (citations omitted). First, the plaintiff must establish a prima facie case. *Sanjuan v. IBP, Inc.*, 275 F.3d 1290, 1294 (10th Cir. 2002). If plaintiff does so, the burden then shifts to the defendant to articulate a non-retaliatory reason for terminating plaintiff. *Id.* Then, plaintiff shoulders the ultimate burden to show that defendant's non-retaliatory reason was pretextual. *Id.* The court applies all three steps below.

### 1.      Prima Facie Case

In retaliation cases, the framework begins with the prima facie case. A "plaintiff makes a prima facie claim by showing (1) that [s]he filed a claim for workers compensation benefits or sustained an injury for which [s]he might assert a future claim for such benefits; (2) that the employer had knowledge of the compensation claim or the fact that [s]he sustained a work-related injury for which the plaintiff might file a future claim for benefits; (3) that the employer

terminated the plaintiff's employment; and (4) that a causal connection existed between the protected activity or injury and the termination." *Sanjuan*, 275 F.3d at 1294.

Walmart assumes for summary judgment purposes that plaintiff has established a prima facie case. Doc. 95 at 12. Because plaintiff's prima facie case is not at issue, the court likewise accepts Walmart's assumption about this burden. And, plaintiff has established her prima facie case. *First*, she sustained an injury to her wrist that could support a future workers' compensation claim. *Second*, Walmart had knowledge of that injury. *Third*, Walmart terminated plaintiff's employment. And *fourth*, there was a causal connection between Walmart's undisputed knowledge of plaintiff's injury and its decision to fire her—both occurred on the same shift on April 14. *See Fye v. Okla. Corp. Comm'n*, 516 F.3d 1217, 1228 (10th Cir. 2008) (holding that temporal proximity of "less than two weeks" was "alone sufficient to establish a causal connection between [plaintiff's] protected activity and termination"). The court thus concludes that plaintiff has established her prima facie case of retaliatory discharge.

## 2. Non-Retaliatory Reason

So, the burden shifts to Walmart to show a non-retaliatory reason for firing plaintiff. *Sanjuan*, 275 F.3d at 1294. At this second step of the *McDonnell-Douglas* framework, the defendant doesn't "'need to litigate the merits of the reasoning, nor does it need to prove that the reason relied upon was bona fide, nor does it need to prove that the reasoning was applied in a nondiscriminatory fashion.'" *Frappied v. Affinity Gaming Black Hawk, LLC*, 966 F.3d 1038, 1058 (10th Cir. 2020) (quoting *EEOC v. Flasher Co.*, 986 F.2d 1312, 1316 (10th Cir. 1992)). "This stage of the analysis only requires the defendant to articulate a reason for the discipline that is not, on its face, prohibited and that is reasonably specific and clear." *Id.* (quotation cleaned up).

The court's earlier Order already concluded that Walmart articulated such a non-retaliatory reason.  *See* Doc. 87 at 17.  Walmart fired plaintiff based on its belief that she violated Walmart policy 763e by failing to report her injury in the same shift in which it occurred.  Doc. 95 at 13; *see also* Doc. 95-10 at 1 (Policy 763e).  Because Walmart Form 670e designated this violation as a "Step 1" violation, and the Conduct Disciplinary Action Guidelines provided that seasonal associates like plaintiff "should be terminated when their coaching has progressed to a formal written" violation, the decisionmakers here believed they had to terminate plaintiff's employment.  *See* Doc. 95-9 at 1 (Form 670e); Doc. 95-19 at 1 (Conduct Disciplinary Action Guidelines); Doc. 95-2 at 42 (Pl.'s Dep. 105:10–13); Doc. 95-5 at 7 (Whitenack Dep. 20:3–19); Doc. 95-6 at 6 (Medaris Dep. 79:1–18).  As the court previously concluded, when "'an employee violates an employer's policies . . . it will often be the case that the employer can assert a legitimate, non-retaliatory reason for taking an adverse employment action against the employee.'"  Doc. 87 at 16 (quoting *Vaughn v. Epworth Villa*, 537 F.3d 1147, 1152 n.3 (10th Cir. 2008)); *see also Frappied*, 966 F.3d at 1058 (concluding that "violations of company policy" were "legitimate, nondiscriminatory reasons for [employer's] termination of each plaintiff").

Resisting this conclusion, plaintiff resurrects an argument the court already has rejected. Plaintiff argues that Walmart's policy requiring an employee to report an injury in the same shift when it occurred undermines Kansas public policy, as reflected in Kan. Stat. Ann. § 44-520(a)(1)(A).  Doc. 98 at 50–51.  That statute allows an employee to file a workers' compensation claim so long as the employee provided notice of her injury to her employer within 20 days of injury.  Kan. Stat. Ann. § 44-520(a)(1)(A).  Plaintiff reasons that this 20-day reporting period allows an employee to file a claim for an injury that doesn't become

immediately apparent, such as an injury caused by "repetitive trauma."  Doc. 98 at 50–51.  But, plaintiff argues, Walmart's policy allows it to fire an employee "for reporting an injury caused by repetitive trauma unless the employee reported the pain the first time the pain was felt."  *Id.* at 51.[7]  Plaintiff thus concludes that Walmart's rules undermine the public policy of Kansas.  *Id.* But this argument fails for two reasons.

*First*, the court already concluded that plaintiff's argument "misconstrues this statute."  Doc. 87 at 17.  "Section 44-520 requires employees, if they wish to preserve their right to recover under Kansas's workers compensation laws, to report their injuries within 20 days after they occur."  *Id.*  "It does not forbid employers from adopting . . . workplace policies requiring their employees to report workplace injuries on a prompter basis."  *Id.*  *Second*, other district courts in our Circuit have concluded that timely reporting rules like Walmart's are legitimate, nonretaliatory reasons for terminating employee/plaintiffs who violated such rules.  *See, e.g.*, *Charney v. United Airlines, Inc.*, No. 19-CV-01700-NYW, 2020 WL 6450445, at *14 (D. Colo. Nov. 2, 2020) (finding that defendant offered non-retaliatory reason for terminating plaintiff where plaintiff violated company policy requiring employees to "immediately report any workplace injury to the employee's supervisors at the time of occurrence" (quotation cleaned up)); *Ramirez v. Goodyear Tire & Rubber Co.*, No. CV-13-85-R, 2014 WL 3744166, at *2 (W.D. Okla. July 30, 2014) (granting summary judgment to employer where plaintiff reported

---

[7]    Plaintiff claims that she is such an employee.  Throughout her briefing, plaintiff tries to argue that her wrist injury wasn't really an injury at all, but rather a "soreness" that later developed into an injury. *See, e.g.*, Doc. 98 at 60.  But plaintiff, in her written statement to Walmart, conceded that she had "injured" her wrist at work, and that during the shift when she sustained her injury, her wrist went from an "ache" to "throbbing pain" to "excruciating" pain by the time she left work.  *See* Doc. 98-14 at 2.  No reasonable juror could find or infer that plaintiff hadn't sustained an "injury" at work.  So, the court rejects plaintiff's argument that she didn't technically "injure" her wrist and so Walmart shouldn't have fired her for failing to report it immediately.

workplace injury five days after it occurred, violating employer's policy requiring employees to report workplace injuries "immediately after discovered").

Also, while neither the Kansas Supreme Court nor the Tenth Circuit has addressed plaintiff's argument directly, both courts have noted—without criticism—timely reporting rules like Walmart's.  In *Asp v. McPherson County Highway Department*, 388 P.2d 652, 655 (Kan. 1964), the employer had adopted a rule requiring employees to report an injury "immediately after the accident" (or seven days after it, at the latest), or else "relinquish all rights to claim for damages."  The Kansas Supreme Court made no comment about the legality of this policy even though Kansas law, at that time, gave injured workers 10 days to provide notice of an injury to their employer.  *See id.* at 656 (citing Kan. Stat. Ann. § 44-520 (1949)).  And in *Alires v. Amoco Production Co.*, 774 F.2d 409, 410 (10th Cir. 1985), the Tenth Circuit affirmed dismissal of a plaintiff's discrimination claim where an employer had disciplined the plaintiff for failing to "promptly report all injuries, regardless of their apparent severity."  Again, the court is mindful that neither one of these cases directly addressed an argument like plaintiff's.  Indeed, it's likely the plaintiffs in those cases didn't raise such an argument.  But in the absence of any authority to support plaintiff's argument, those cases are all the court has.[8]

---

[8]         Plaintiff cites *Coleman v. Safeway Stores, Inc.*, 752 P.2d 645 (Kan. 1988), to argue that Walmart's injury reporting rule undermines Kansas public policy.  In *Coleman*, the Kansas Supreme Court concluded that allowing "an employer to discharge an employee for being absent or failing to call in an anticipated absence as the result of a work-related injury would allow an employer to indirectly fire an employee for filing a workers' compensation claim, a practice contrary to the public policy of this state[.]"  *Id.* at 652.  But as Walmart highlights, the Kansas Supreme Court later expressly disapproved of this impermissibly broad liability language.  *See Gonzalez-Centeno v. N. Cent. Kan. Reg'l Juv. Det. Facility*, 101 P.3d 1170, 1175 (Kan. 2004) ("The first question we consider is whether the broad liability language from *Coleman* reflects current law, and the answer is no.  With a variety of facts presented and a burden-shifting analysis adopted in subsequent cases, the statement from *Coleman* has been treated not as a rule of law but rather as depending on the peculiar circumstances of each case.").  Thus, *Coleman* is not an ace in the hole for plaintiff.  And, as *Gonzalez* highlighted, under the burden-shifting framework adopted post-*Coleman* for retaliatory discharge cases, it's inappropriate to evaluate the merits of an employer's policy at the second step of the framework, which requires only a facially legitimate and non-retaliatory reason for discharge.  *See Gonzalez*, 101 P.3d at 1177 (noting that, at step two of the burden-

Walmart cites an out-of-circuit case—*Yowell v. Administrative Review Board, United States Department of Labor*, 993 F.3d 418 (5th Cir. 2021)—with nearly identical facts.  But that case dealt with causation standards under the Federal Railroad Safety Act.  In that different statutory setting, the court is reluctant to adopt the Fifth Circuit's reasoning and apply it to this case.  But for what it's worth, *Yowell* recognized the conceptual difficulty with timely reporting rules like Walmart's, where "an employee's protected act itself reveals, or at least leads to the discovery of, conduct for which discipline is otherwise appropriate."  993 F.3d at 422.  Ultimately, the Fifth Circuit held that without evidence "that company representatives attempted to prevent [plaintiff's] report [of his workplace injury] or discouraged him from reporting," an employer didn't violate the Federal Railroad Safety Act by firing an employee for failing to report a work injury promptly.  *Id.* at 427; *see also id.* at 427–28 ("There is unchallenged evidence in the record that it was not the fact of reporting an injury but the failure to report promptly an earlier injury that caused Yowell to be discharged.").

Walmart's burden at this second step of the *McDonnell-Douglas* framework is light.  "This stage of the analysis only requires the defendant to articulate a reason for the discipline that is not, on its face, prohibited and that is reasonably specific and clear."  *Frappied*, 966 F.3d at 1058.  Walmart has done that.  And plaintiff hasn't convinced the court that Walmart's timely reporting rule, on its face, undermines Kansas public policy.  All the authority the court has suggests the opposite.  The court thus concludes that Walmart has offered a legitimate, non-retaliatory reason for terminating plaintiff's employment.  So, the court proceeds to pretext.

---

shifting framework, *Coleman* "does not preclude an employer from invoking the attendance record of an employee who claims a work-related injury as a facially legitimate reason for an employee's termination").

### 3.    Pretext

Because Walmart has articulated a legitimate, nonretaliatory reason for plaintiff's

termination, the *McDonnell Douglas* test shifts the burden back to plaintiff.  At this step, plaintiff

must show—by clear and convincing evidence—that a reasonable juror could find it "highly

probable" that the stated reason is pretextual.  *See Foster v. Alliedsignal, Inc.*, 293 F.3d 1187,

1195 (10th Cir. 2002) (establishing that a Kansas retaliatory discharge plaintiff suing in federal

court must show "clear and convincing" evidence of retaliation at the summary judgment stage);

*In re B.D.-Y.*, 187 P.3d 594, 601 (Kan. 2008) (defining "clear and convincing evidence" as

evidence establishing "that the truth of the facts asserted is 'highly probable'").[9]  To make the

---

[9]    The parties dispute whether the clear and convincing evidence standard applies in this federal diversity suit.  Under Kansas law, a plaintiff in a retaliatory discharge case "need not meet the clear and convincing standard at the summary judgment stage of the proceedings."  *Rebarchek v. Farmers Co-op. Elevator*, 35 P.3d 892, 898 (Kan. 2001).  Instead, a plaintiff "can successfully oppose a motion for summary judgment by a preponderance of the evidence."  *Bracken v. Dixon Indus., Inc.*, 38 P.3d 679, 683 (Kan. 2002).

But "a federal court sitting in diversity will be guided by federal-law standards governing summary judgment procedure."  *Foster*, 293 F.3d at 1194–95.  And binding Tenth Circuit precedent holds "that a plaintiff in federal court who opposes a summary judgment in a retaliatory discharge case based on Kansas law must set forth evidence of a clear and convincing nature that, if believed by the ultimate factfinder, would establish that plaintiff was more likely than not the victim of illegal retaliation by her employer."  *Id.* at 1195.

To be sure, the Tenth Circuit has expressed some doubt about this precedent's vitality after the Supreme Court's decision in *Shady Grove Orthopedic Associates, P.A. v. Allstate Insurance Co.*, 559 U.S. 393 (2010).  *See Macon v. United Parcel Serv., Inc.*, 743 F.3d 708, 713 n.2 (10th Cir. 2014) ("'A federal rule, therefore, cannot govern a particular case in which the rule would displace a state law that is procedural in the ordinary use of the term but is so intertwined with a state right or remedy that it functions to define the scope of the state-created right.'" (quoting *Shady Grove*, 559 U.S. at 423 (Stevens, J., concurring); then citing *James River Ins. Co. v. Rapid Funding, LLC*, 658 F.3d 1207, 1217 (10th Cir. 2011) (noting Justice Stevens's concurrence provides the controlling analysis in *Shady Grove*))).  But the Tenth Circuit hasn't overruled *Foster*, so it's still binding precedent.  *See id.* (noting that, under the binding precedent of *Foster*, "the district judge erred in applying the more lenient 'preponderance of the evidence' standard").  Indeed, the Tenth Circuit recently applied the "clear and convincing evidence" standard to a Kansas retaliatory discharge case decided at the summary judgment stage, albeit in an unpublished case.  *See Benjamin v. Bd. of Trs. of Barton Cnty. Cmty. Coll.*, 810 F. App'x 691, 694 (10th Cir. 2020); *see also id.* at 697 (Tymkovich, C.J., dissenting) (emphasizing the clear and convincing evidence standard).  So, bound by Tenth Circuit precedent, the court applies the clear and convincing evidence standard to plaintiff's claim at this summary judgment stage.

requisite showing, plaintiff must provide clear and convincing evidence that "the employer's explanation was so weak, implausible, inconsistent or incoherent" such that a reasonable juror could find it highly probable that the employer's explanation "was not an honestly held belief but rather was subterfuge for [retaliation]." *Young v. Dillon Cos., Inc.*, 468 F.3d 1243, 1250 (10th Cir. 2006).

To analyze whether a reasonable juror could find pretext under this standard, the court doesn't ask "whether the employer's reasons [for terminating plaintiff] were wise, fair or correct[.]" *Riggs v. AirTran Airways, Inc.*, 497 F.3d 1108, 1118 (10th Cir. 2007). Instead, the court asks "whether the employer honestly believed its reasons and acted in good faith upon them," *id.* at 1119, "even if they later prove to be untrue," *Young*, 468 F.3d at 1250. The court thus considers "the facts as they appeared to the person making the decision," and doesn't "second-guess the employer's decision even if it seems in hindsight that the action taken constituted poor business judgment." *Riggs*, 497 F.3d at 1119. "The reason for this rule is plain: [the court's] role is to prevent intentional discriminatory hiring practices, not to act as a 'super personnel department,' second guessing employers' honestly held (even if erroneous) business judgments." *Young*, 468 F.3d at 1250; *see also Rivera v. City & Cnty. of Denver*, 365 F.3d 912, 925 (10th Cir. 2004) ("'An articulated motivating reason is not converted into pretext merely because, with the benefit of hindsight, it turned out to be poor business judgment.'" (quoting *McKnight v. Kimberly Clark Corp.*, 149 F.3d 1125, 1129 (10th Cir. 1998))).

Plaintiff offers seven reasons why Walmart's stated reason for firing her was pretextual. *See* Doc. 98 at 50–59. Recognizing some overlap between those arguments, Walmart offers five responses to plaintiff's seven arguments. *See* Doc. 101 at 21–29. The court doesn't ignore any

of the parties' arguments but concludes that plaintiff's contentions of pretext boil down to three arguments. None are availing.

### a. The Decisionmakers' Testimony

Plaintiff's pretext argument begins where her direct evidence argument left off: the testimony of the three decisionmakers that they wouldn't have fired plaintiff if she hadn't reported her injury. Although the court concluded that this testimony didn't provide direct evidence of retaliation, that doesn't mean that the testimony can't establish pretext. *See Fassbender v. Correct Care Sols., LLC*, 890 F.3d 875, 884–85 (10th Cir. 2018) (determining that supervisor's comments suggesting bias against pregnant employees served as evidence of pretext, even though they didn't qualify as direct evidence of retaliation).

But the court concludes that plaintiff's cited testimony from Mr. Whitenack, Ms. Medaris, and Mr. Usry can't establish pretext sufficient to survive summary judgment. As discussed before, the three decisionmakers' testimony, taken as a whole, shows that all three believed plaintiff hadn't reported her injury in a timely fashion—and that's why she was fired. It's true: they wouldn't have known that plaintiff didn't timely report if she hadn't reported her injury at all. But merely acknowledging that fact doesn't weaken or contradict Walmart's cited reason for firing plaintiff. Nor does it render Walmart's non-retaliatory reason incoherent, or undermine the consistency of Walmart's explanation. On the contrary, throughout the summary judgment record, all three decisionmakers consistently testified that they fired plaintiff because she didn't timely report her injury—and not because she reported the injury in the first place.

Also, when considering the decisionmakers' testimony as a whole, plaintiff's cherry-picked comments pale in comparison to the comments establishing pretext in the Tenth Circuit case cited by plaintiff. *Cf. Fassbender*, 890 F.3d at 884–85 (concluding a reasonable juror could

find pretext where supervisor "made the following remarks:  (1) 'What, you're pregnant too?';
(2) 'I don't know how I'm going to be able to handle all of these people being pregnant at once,';
and (3) 'I have too many pregnant workers, I don't know what I am going to do with all of
them'" (quotation cleaned up)).

In the end, a reasonable juror couldn't find that the few testimonial statements—all
comments taken out of context—could establish that Walmart's non-retaliatory reason for firing
plaintiff was false or otherwise unworthy of belief.

### b.  Walmart's Good Faith Belief That Plaintiff Violated the Timely Reporting Rule

Plaintiff next argues that Walmart's reason for firing her was false.  She contends that a
reasonable juror could conclude that she in fact timely reported her injury during the shift when
it occurred (the April 12–13 overnight shift).  Plaintiff's right.  A reasonable juror could agree
with her because this fact is disputed.  *See* Doc. 95-2 at 14 (Pl.'s Dep. 51:22–23) (plaintiff's
testimony that she told Ms. Wilbur that her wrist was hurting on the morning of April 13); Doc.
95-4 at 2, 3 (Wilbur Dep. 16:4–7, 18:15–17) (Ms. Wilbur's testimony that she doesn't remember
plaintiff telling her about any wrist injury at that time).

But this dispute isn't a material one.  The relevant inquiry is whether the decisionmakers
believed in good faith that plaintiff hadn't reported her injury in a timely fashion.  *Riggs*, 497
F.3d at 1119; *Young*, 468 F.3d at 1250.  So, even assuming plaintiff timely reported her injury,
Mr. Whitenack, Ms. Medaris, and Mr. Usry were under the impression that she didn't.  And,
under well-established principles for showing pretext, it's that impression that matters.  *Rivera*,
365 F.3d at 925 ("Perhaps a reasonable factfinder could observe all the witnesses and believe
Plaintiff's version of the events . . . . [But], that is not the issue."); *see also Swackhammer v.
Sprint/United Mgmt. Co.*, 493 F.3d 1160, 1170 (10th Cir. 2007) (explaining that, when analyzing
pretext, "it is not what [a decisionmaker] *should* have known that matters, but whether he acted

in good faith upon the beliefs he held"); *Benjamin v. Bd. of Trs. of Barton Cnty. Cmty. Coll.*, 810 F. App'x 691, 694–95 (10th Cir. 2020) (noting in a Kansas retaliatory discharge case that "'[t]he pertinent question in determining pretext is not whether the employer was right to think the employee engaged in misconduct, but whether that belief was genuine or pretextual'" (quoting *Pastran v. K-Mart Corp.*, 210 F.3d 1201, 1206 (10th Cir. 2000))).

This principle requires the court to place itself in the shoes of Mr. Whitenack, Ms. Medaris, and Mr. Usry.  Here's what they knew:  plaintiff reported a wrist injury on the night of Tuesday, April 14 to Ms. Wilbur, who then told Mr. Whitenack.  Doc. 95-2 at 31–32 (Pl.'s Dep. 83:24–84:13); Doc. 95-5 at 3, 10 (Whitenack Dep. 8:19–22, 79:2–7).  Plaintiff then wrote a statement saying that on Monday morning, April 13, she noticed that her wrist had started to hurt.  Doc. 98-14 at 2.  But this statement didn't say anything about plaintiff reporting her injury at that time.  *See id.*  Plaintiff argues this is so because Mr. Whitenack didn't ask her, specifically, whether she had reported her injury to anyone.  He also didn't give her the correct Associate Incident Report—which would've asked plaintiff when she reported her injury and to whom.  For those reasons, plaintiff contends, Mr. Whitenack couldn't have believed in good faith that plaintiff had violated Walmart policy by not timely reporting her injury.  *See* Doc. 98 at 54.

But the summary judgment record rejects plaintiff's argument.  Although it's not entirely clear how Mr. Whitenack arrived at his belief that plaintiff didn't report her injury timely, his contemporaneous text message exchange with Mr. Usry establishes that he held this belief as plaintiff was writing her statement:

> MR. WHITENACK:  Just talked to [plaintiff].  She said she hurt her wrist Sunday (doesn't know how) and didn't tell anyone
>
> MR. USRY:  Hurt how? Can she write a statement.  She only get coached if she describes pain

MR. WHITENACK:  Yes I'll have her write a statement

Doc. 95-11 at 1.

Mr. Whitenack also asked "How long do they [employees] have to report? EOS [End of shift]?"  *Id.*  Mr. Usry didn't respond directly to this question.  But after Mr. Whitenack sent a picture of plaintiff's statement—which again didn't mention anything about plaintiff reporting her injury earlier—Mr. Usry said:  "Yea, that would be a coaching.  Is HR on site?  Would she be termed with a written coaching?"  *Id.* at 2.  Mr. Whitenack responded: "Let me ask[.]"  *Id.* The contemporaneous text messages establish that both Mr. Whitenack and Mr. Usry believed plaintiff hadn't reported her injury in a timely fashion.

Shifting gears to Ms. Medaris, who at that point in time, knew only what Mr. Whitenack knew.  *See* Doc. 95-13 at 1–2 (Medaris Decl. ¶ 5) ("Whitenack . . . informed me that [plaintiff] had injured her wrist during her April 12–13, 2020 overnight shift . . . [but] first reported her injury to Walmart during her April 14–15, 2020 overnight shift.").  When Mr. Whitenack brought plaintiff to the HR office to meet with him and Ms. Medaris, he told plaintiff that she was "supposed to report [her] work injury . . . within 24 hours[.]"  Doc. 95-2 at 42 (Pl.'s Dep. 105:13–15).  And, he explained, because plaintiff was a temporary employee, he and Ms. Medaris could fire her without warning for violating that rule.  *Id.* at 42 (Pl.'s Dep. 105:15–18).

It's undisputed that plaintiff—at that point in time—hadn't said anything about reporting her injury to Ms. Wilbur at the end of her April 12–13 shift.  *Id.* at 42–43 (Pl.'s Dep. 108:12–109:1).  So, Ms. Medaris had no reason to believe that plaintiff had reported her injury when it occurred.  And her contemporaneous email to Mr. Usry after firing plaintiff confirms this understanding:  "We have completed [plaintiff's] termination for late reporting."  Doc. 95-15 at 1 (noting timestamp of Wednesday, April 15, 2020 at 12:15 a.m., less than an hour after Walmart had terminated plaintiff); Doc. 93 at 3 (Pretrial Order ¶ 10) (stipulated that Walmart terminated

plaintiff on April 14, 2020 before 11:32 p.m.).  In short, the contemporaneous evidence in the

summary judgment record establishes the undisputed fact that all three decisionmakers

believed—in the moments before, during, and after plaintiff's termination—that she had violated

Walmart policy by not reporting her injury timely.

And all three decisionmakers' testimony is consistent with that contemporaneous

evidence.  Mr. Whitenack testified that when he fired plaintiff, he didn't know plaintiff allegedly

had reported her injury to Ms. Wilbur at the end of her April 12–13 shift.  Doc. 95-5 at 8

(Whitenack Dep. 77:13–20).  He testified that when he decided to fire plaintiff, he "was under

the impression that she was reporting an injury late[.]"  *Id.* at 5 (Whitenack Dep. 14:13–14).  Ms.

Medaris similarly testified that she terminated plaintiff "based on her statement that she reported

late."  Doc. 98-13 at 4 (Medaris Dep. 17:7–11).  And Mr. Usry likewise testified—as the

company's Rule 30(b)(6) representative—that Walmart terminated plaintiff's employment for

failing to report her injury in a timely manner.  *See* Doc. 98-12 at 10 (Usry 30(b)(6) Dep.

120:15–19); *see also id.* at 8 (Usry 30(b)(6) Dep. 45:19–23).

At bottom, nothing in the summary judgment record casts doubt on the decisionmakers'

good faith belief that plaintiff didn't report her injury timely.  "[W]hile evidence amassed during

discovery may well suggest that [Walmart's] beliefs . . . were wrong," and that plaintiff perhaps

did report her injury in a timely fashion, that evidence "do[es] not suggest [Walmart's] beliefs

were held in bad faith."  *Young*, 468 F.3d at 1251.  Nor is there any fact "suggesting that relevant

evidence was deliberately suppressed from the decision makers or ignored in order to further a

[retaliatory] purpose."  *Id.*  Instead, the summary judgment record consistently confirms that the

decisionmakers believed plaintiff didn't report her injury timely and they thus fired her on that

basis.  A reasonable juror thus would have no reason to doubt the good faith of the

decisionmakers' beliefs.  *See Rivera*, 365 F.3d at 925 (affirming summary judgment for employer because even though "a reasonable factfinder could . . . believe [p]laintiff's version of the events[,]" that evidence didn't create a genuine issue that the employer's "expressed reason for terminating [p]laintiff must have been pretextual").

Finally, on a somewhat related note, plaintiff highlights that Walmart didn't investigate plaintiff's injury further or inquire whether she actually reported her injury, thus undermining any good faith belief that she violated Walmart policy.  *See* Doc. 98 at 54–55.  Plaintiff's correct. Walmart didn't investigate her injury.  Nor does the record suggest that any of the three decisionmakers expressly asked plaintiff whether she had reported her injury when it occurred. But the record consistently establishes that all three believed she hadn't.  And plaintiff gave them no reason to believe she had.  Again, it's undisputed that when Mr. Whitenack told plaintiff that she should've reported her injury within 24 hours, plaintiff didn't give any indication that she had told Ms. Wilbur during the April 12–13 shift that her wrist was hurting her.  Her written statement didn't say as much.  And Ms. Wilbur didn't remember (and more importantly, didn't report) anything about plaintiff's injury during the April 12–13 shift.

So, while a more conscientious or careful manager might have inquired more thoroughly before determining whether plaintiff had violated Walmart's rule, the three decisionmakers here had no reason to believe that plaintiff actually had reported her injury to Ms. Wilbur shortly after it occurred.  Walmart's failure to inquire more thoroughly, or investigate more adequately, doesn't so undermine the decisionmakers' good faith belief that "a reasonable fact finder could conclude that it was not an honestly held belief but rather was subterfuge for [retaliation]." *Young*, 468 F.3d at 1250.  True, one might conclude that Walmart didn't make the savviest business judgment.  But that's beside the point, for the court's "role is . . . not to act as a 'super

personnel department,' second guessing employers' honestly held (even if erroneous) business judgments."  *Id.*

### c. Walmart's Failing to Follow Internal Policies

The heart of plaintiff's next pretext argument is that Walmart failed to follow its internal policies after she reported her injury.  As a reminder, Walmart's Dot Com Safety policy required it to take several actions whenever an employee reported a workplace injury:

- provide the employee with an "Associate Incident Report," with its specific questions asking when an employee reported his or her injury and to whom;

- complete a "First Report of Injury Form" if required by the State of Kansas;

- record the incident in Walmart's "Incident Reporting System" within 24 hours of the incident;

- complete a "Safety Incident Investigation" form and follow an 8-step review and investigation process;

- and follow up with the employee for seven days after her injury.

Doc. 98-11 at 4–7.  *But see id.* at 4 (prefacing that "Associates involved in an incident will report it to their manager immediately" and that "[f]ailure to do so may result in disciplinary action").

It's undisputed that Walmart didn't do those things.  But "the standard for establishing pretext requires evidence of not just any procedural shortfall, but of a 'disturbing procedural irregularity,' often exemplified by an employer's 'falsifying or manipulating of relevant criteria[.]'"  *Cooper v. Wal-Mart Stores, Inc.*, 296 F. App'x 686, 696 (10th Cir. 2008) (first quoting *Timmerman v. U.S. Bank, N.A.*, 483 F.3d 1106, 1122 (10th Cir. 2007); then quoting *Plotke v. White*, 405 F.3d 1092, 1104 (10th Cir. 2005)) (affirming summary judgment for employer because deviation from company policy was insufficient evidence of pretext).  "'[T]he mere fact that an employer failed to follow its own internal procedures does not necessarily suggest that the employer was motivated by illegal [retaliatory] intent or that the substantive

reasons given by the employer for its employment decision were pretextual.'" *Fassbender v. Correct Care Sols., LLC*, 890 F.3d 875, 889 (10th Cir. 2018) (quoting *Randle v. City of Aurora*, 69 F.3d 441, 454 (10th Cir. 1995)). "The question is whether the jury could conclude that the procedural irregularities were somehow related to the decision-maker's [retaliatory] purpose." *Id.*

Plaintiff contends that Walmart's procedural irregularities here connected to a retaliatory purpose. Although plaintiff highlights several of Walmart's shortcomings, she hones in on three: (1) Walmart's failing to give her proper documents informing her of her right to file a workers' compensation claim; (2) Walmart's failing to give her an "Associate Incident Report" that would've asked her to specify when she reported her injury and to whom; and (3) Walmart's failing to discipline her progressively with a "Step 1" written violation, rather than terminating her immediately.

### i.  Walmart's Failing to Provide Proper Documents and Report Plaintiff's Injury

Plaintiff first directs attention to several documents that Walmart should have given her to inform her about workers' compensation claims. *See* Doc. 98 at 56–57. She also highlights that Walmart didn't report her injury to the State of Kansas, as Kansas law requires. *See id.* at 56. Plaintiff argues that Walmart's failure to create the "proper paper trail" allowed Walmart to "deny receiving notice" of plaintiff's injury for any future workers' compensation claim she might file. *Id.* at 57. But the court doesn't find these irregularities meaningful to the correct pretext analysis.

The Tenth Circuit has explained repeatedly that "disturbing procedural irregularities" refer to an employer's "falsifying or manipulating . . . criteria" for firing an employee. *Garrett v. Hewlett-Packard Co.*, 305 F.3d 1210, 1217 (10th Cir. 2002); *Jaramillo v. Colo. Jud. Dep't*, 427

F.3d 1303, 1308 (10th Cir. 2005), *as modified on denial of reh'g* (Dec. 20, 2005).  Also, the

Tenth Circuit precedent cited by plaintiff instructs that the most relevant procedural irregularities

are those connected with the termination decision.  *See Fassbender*, 890 F.3d at 889

("Procedural irregularities can suggest the existence of illegal discrimination where the

disregarded procedures directly and uniquely disadvantaged a minority employee." (quotation

cleaned up)); *Plotke*, 405 F.3d at 1104 (explaining that "procedural irregularities" surrounding

plaintiff's "termination constitute relevant evidence of pretext going to the termination

decision").

In *Fassbender*, the Tenth Circuit determined that a decisionmaker's failure to write a

narrative justifying plaintiff's termination could serve as evidence of pretext.  890 F.3d at 889.

The Tenth Circuit reasoned that a reasonable juror could conclude that this failure "allowed [the

employer] to change its explanation for firing" the plaintiff.  *Id.*  And indeed, that's what the

employer did.  *Id.*  (emphasizing, as a part of the pretext analysis, that the employer was

"inconsistent" in explaining why it fired plaintiff).  Similarly, in *Plotke*, the relevant "procedural

irregularity" was the absence of a documented justification for plaintiff's termination.  In that

case, the summary judgment record presented a genuine dispute whether the decisionmakers,

after firing plaintiff, had fabricated documents "to build a file to support the termination

decision."  405 F.3d at 1104–05.  And, in both cases, the Tenth Circuit emphasized that the

procedural irregularity was just one piece of the larger body of evidence from which a reasonable

juror could find pretext.  *Fassbender*, 890 F.3d at 890 (emphasizing the "totality" of the pretext

evidence, including the decisionmaker's discriminatory comments and the employer's shifting

explanations for terminating plaintiff); *Plotke*, 405 F.3d at 1105–07 (concluding that procedural

irregularity could show pretext, "especially when viewed in the aggregate with the other

35

evidence" of pretext, including evidence that the decisionmakers "contriv[ed] and grossly exaggerate[ed]" the incident leading to plaintiff's termination, as well as derogatory gender-based comments against plaintiff).

Here, Walmart's actions (or lack of them) unquestionably were sloppy. But Walmart didn't falsify or fabricate any documents or policies to justify terminating plaintiff. Nor did Walmart shift its reasons for terminating plaintiff. Quite the opposite: Walmart policy requires associates to report their injuries by the end of the shift when the injury occurred. And Walmart policy directs that managers "should . . . terminate[ ]" Jet seasonal associates like plaintiff when they violate serious safety rules. Doc. 95-19 at 1. More importantly, as explained before, the summary judgment record shows contemporaneous evidence from all three decisionmakers—before, during, and after plaintiff's termination—that they fired her because they believed she didn't timely report her injury and that Walmart policy thus required her termination. In other words, Walmart's failures to report plaintiff's injury to the State or provide her with proper documents weren't connected with the *decision* to terminate plaintiff. So, no reasonable juror could conclude that Walmart's failures represent the type of disturbing procedural irregularity the Tenth Circuit requires to support a finding of pretext.

Walmart's failures and sloppy business practice here make a mess of what otherwise would be a straightforward case. But still, plaintiff's pretext evidence doesn't provide the *clear and convincing* evidence she must adduce at this stage to create a genuine dispute about Walmart's good faith belief that it fired her for violating a workplace rule. *See Foster*, 293 F.3d at 1195 (requiring a Kansas retaliatory discharge plaintiff in federal court to show clear and convincing evidence of pretext at the summary judgment stage). In other words, no reasonable juror could conclude from Walmart's failures that it was "highly probable" that Walmart's

reason for firing plaintiff was false or otherwise unworthy of belief.  *In re B.D.-Y.*, 187 P.3d 594, 601 (Kan. 2008) (defining "clear and convincing evidence" as evidence establishing "that the truth of the facts asserted is 'highly probable'").  Thus, this pretext evidence fails to negate summary judgment.

### ii.      Walmart Giving Plaintiff the Wrong Form to Report Her Injury

The summary judgment record also confirms that Walmart gave plaintiff a blank statement form, and not the "Associate Incident Report" that asks specific questions about an employee's injury—including when the employee reported the injury and to whom.  *Compare* Doc. 98-14 at 2 (Plaintiff's Statement Form), *with* Doc. 98-15 at 2 (Associate Incident Report). The parties dispute whether Mr. Whitenack told plaintiff to include that specific information in her statement.  *Compare* Doc. 98-2 at 18 (Pl.'s Dep. 87:18–21) ("Q.  Did this male manager [Mr. Whitenack] ask you if you had told anybody else . . . about the discomfort you were feeling in your wrist?  A.  No."), *with* Doc. 95-5 at 10–11 (Whitenack Dep. 79:24–80:3) ("I always instructed everybody who was filling out a safety form to include when the injury occurred.  And then I would ask them if they reported it to anyone, to ensure that we were able to . . . follow-up with any leaders who . . . were involved in that.").  But it's undisputed that plaintiff's statement never mentions whether she had reported her injury to Ms. Wilbur or anyone else during the shift when she sustained her injury.  And, more importantly, it's undisputed that plaintiff doesn't claim she *had* reported timely when Mr. Whitenack later told her Walmart was firing her for failing to do so.  Doc. 95-2 at 43–44 (Pl.'s Dep. 108:22–109:1) ("Q.  Did you tell the male manager [Mr. Whitenack] or [Ms.] Morgan [Medaris], the HR representative in the office, that you had reported your injury on the morning of April 13th?  A.  No.").

But, plaintiff argues, had Walmart supplied her with the correct form, she would've informed Walmart's management that she timely reported her injury to Ms. Wilbur.  Fortunately, the Tenth Circuit has supplied helpful guidance on this precise point.  In a case where an employer summarily terminated an employee while she was on vacation, the Tenth Circuit held that the employer's failure to give plaintiff the chance to respond to allegations of misconduct wasn't pretext, even though the employer typically spoke with employees before firing them. *See Riggs v. AirTran Airways, Inc.*, 497 F.3d 1108, 1119 (10th Cir. 2007) (affirming summary judgment for the employer based on insufficient pretext evidence).  The Tenth Circuit concluded that while "allowing [the plaintiff] to complete her side of the story would seem to be the most fair way of addressing the situation, we cannot say that [the employer's] failure to do so in these circumstances constitutes a 'disturbing procedural irregularity' sufficient to prove pretext."  *Id.* Applying *Riggs*'s reasoning here, the court concludes that Walmart's failure to give plaintiff the right form—which might have elicited relevant information telling plaintiff's side of the story— isn't the kind of "disturbing procedural irregularity" sufficient to prove pretext.  *Id.*; *see also Cooper*, 296 F. App'x at 696 (affirming summary judgment for employer where plaintiff hadn't "proffered evidence of a disturbing procedural irregularity based upon Wal–Mart's failure to get his side of the story before deciding to terminate him").

In short, nothing in the summary judgment record could permit a reasonable juror to draw the inference that Walmart intentionally withheld the Associate Incident Report from plaintiff to prevent her from informing the decisionmakers of a timely report of her injury.  *See Hysten v. Burlington N. Santa Fe Ry. Co.*, 415 F. App'x 897, 910 (10th Cir. 2011) (concluding that plaintiff failed to show pretext where "the record contain[ed] no evidence that . . . decision- makers falsified reports of [plaintiff's] misconduct or manipulated company rules, such that

[plaintiff] was improperly found guilty of misconduct"); *cf. Plotke*, 405 F.3d at 1105 (concluding

that plaintiff established genuine issue of pretext where there was evidence that decisionmakers

fabricated documents "to build a file to support the termination decision"). So, Walmart's failure

to give her that form can't establish pretext.

### iii.    Walmart's Alleged Deviation from its Disciplinary Procedures

Finally, plaintiff argues, Walmart deviated from its policy by immediately terminating

her employment, rather than issuing her a "Step 1" violation. Walmart Form 670e notes that

"[f]ailure to report any known injury before the end of shift" is a "Step 1" violation. Doc. 95-9.

Form 670e also notes that any "repeat of the same violation within 180 calendar days"

potentially could result in termination. *Id.* Thus, plaintiff contends, Walmart shouldn't have

fired her for a Step 1 violation unless she was repeating the same violation within 180 days.

Doc. 98 at 58.

But plaintiff's argument ignores Walmart's Conduct Disciplinary Action Guidelines.

They provide that "Jetflex and Jet Seasonal [associates] should be terminated when their

coaching has progressed to a formal written[.]" Doc. 95-19 at 1. Mr. Usry testified as

Walmart's corporate representative that when one views Walmart's policies together, plaintiff's

"late reporting aligned to a Step 1 on the 670," "Step 1 was written coaching[,]" and "for

temporary associates . . . that written coaching would result in termination." Doc. 98-4 at 26

(Usry 30(b)(6) Dep. 108:14–18). Mr. Whitenack similarly testified that he relied on Form 670e

and the Conduct Disciplinary Action Guidelines in deciding to terminate plaintiff's employment.

Doc. 95-5 at 7 (Whitenack Dep. 20:3–19). Ms. Medaris reiterated this point in her testimony and

in a Declaration. *See* Doc. 95-6 at 6 (Medaris Dep. 79:1–18); *see also* Doc. 95-13 at 2 (Medaris

Decl. ¶ 8) ("Based upon my conclusion that [plaintiff's] violation of Policy 670e warranted a

First Written disciplinary action, and because [she] was a Jet Seasonal associate, I concluded that [her] employment was to be terminated pursuant to Policy 670e and Walmart's Conduct Disciplinary Action Guidelines.").

The decisionmakers thus followed Walmart policies, as those policies are set forth in the summary judgment record. And, at very least, they *believed* they were following what Walmart policies required, which is the relevant inquiry. *See Berry v. T-Mobile USA, Inc.*, 490 F.3d 1211, 1222 (10th Cir. 2007) (concluding "decisionmakers did not believe a rigid policy existed," and so their mistake in failing to follow that policy didn't show pretext). The Tenth Circuit has reminded district courts that an "employee's mere allegation that his employer deviated from company policy is insufficient to prove pretext; rather, the employee must present evidence that the employer *believed* that a relevant company policy existed, and chose to deviate from the policy in spite of that belief." *Hysten*, 415 F. App'x at 910 (citing *Berry*, 490 F.3d at 1222) (further citation omitted); *see also DePaula v. Easter Seals El Mirador*, 859 F.3d 957, 976 n.25 (10th Cir. 2017) (quoting this portion of *Hysten* for its persuasive value). The inverse of these principles applies here. It's undisputed that Walmart's decisionmakers believed that the Conduct Disciplinary Action Guidelines required them to terminate plaintiff for her Step 1 violation. And there is nothing in the summary judgment record suggesting that the decisionmakers believed some other policy applied and it would have or even could have prohibited them from firing plaintiff. Nor is there evidence that the decisionmakers chose to deviate from such a policy to terminate plaintiff's employment.

Even if the court accepted plaintiff's argument that Walmart should've disciplined her instead of terminating her, that's still not enough to create a triable issue about pretext. Perhaps plaintiff is correct that Walmart didn't have to terminate her employment. The Conduct

Disciplinary Action Guidelines provide that a Jet seasonal associate like plaintiff "*should* be terminated when their coaching has progressed to a formal written[.]"  Doc. 95-19 at 1 (emphasis added).  But that doesn't mean that Walmart was required to discipline her progressively.  And "where progressive discipline is entirely discretionary, and the employer did not ignore any established company policy in its choice of sanction, the failure to implement progressive discipline is not evidence of pretext."  *Lobato v. N.M. Env't Dep't*, 733 F.3d 1283, 1291 (10th Cir. 2013) (quotation cleaned up) (affirming summary judgment for employer because of insufficient pretext evidence); *see also Berry*, 490 F.3d at 1222 ("[E]ven if [the employer] fell short of [plaintiff's] expectation of progressive discipline, this fact adds little to the pretext analysis" because the "'mere fact that an employer failed to follow its own internal procedures does not necessarily suggest that . . . the substantive reasons given by the employer for its employment decision were pretextual.'" (quoting *Randle v. City of Aurora*, 69 F.3d 441, 454 (10th Cir. 1995))).

Walmart didn't ignore established company policy in terminating plaintiff, a seasonal associate who Walmart believed had violated a policy requiring a formal written violation.  Instead, the summary judgment record establishes that Walmart consistently applied its Conduct Disciplinary Action Guidelines and regularly terminated seasonal associates at the Edgerton facility where plaintiff worked when they received their first written violation.  Doc. 95–16 (employment records); *see also* Doc. 98 at 25–26 (plaintiff acknowledging that it's uncontroverted that "Walmart terminated 113 seasonal associates from the Edgerton facility because they received a first written discipline").  On this summary judgment record, plaintiff hasn't discharged her burden to identify clear and convincing evidence permitting a reasonable juror to conclude that it was highly probable that Walmart's reason for firing plaintiff was

pretextual.  *See Lobato*, 733 F.3d at 1290 (holding that employer's failure to discipline probationary employee progressively didn't show pretext where employer's policy permitted immediate termination of probationary employees); *see also Berry*, 490 F.3d at 1222 (affirming summary judgment for employer where record established that employer regularly fired employees "without warning or prior disciplinary measures," and so employer's failure to follow "general progressive disciplinary strategies" when it terminated plaintiff couldn't show pretext).

In the end, plaintiff argues that Walmart's decision to fire her was unfair and subjectively unreasonable.  She argues that Walmart didn't even provide proper notice of its rule requiring immediate reporting of workplace injuries.  And there is evidence in the record to support that position.  *See* Doc. 95-14 at 2 (plaintiff's text to fellow associate that she "couldn't remember hearing anything about" the rule in her training); Doc. 95-15 (Medaris email to Usry expressing concern that Walmart's safety school training didn't inform employees when to report an injury).  But a reasonable juror couldn't conclude that plaintiff has come forward with clear and convincing evidence of pretext.  In other words, none of plaintiff's pretext arguments show that it is "highly probable" that Walmart terminated plaintiff in retaliation for reporting a workplace injury.

Admittedly, the situation here presents another relatively close call—especially because Walmart made such a mess of things.  But, ultimately, the court is guided by two legal principles:  (1) plaintiff hasn't shown *clear and convincing* evidence of pretext, as she must at this stage, *see Foster*, 293 F.3d at 1195, and (2) the court isn't a "'super personnel department,' second guessing employers' honestly held (even if erroneous) business judgments," *Young*, 468 F.3d at 1250.

Perhaps Walmart's decision was unwise.  Maybe it should've investigated more thoroughly and specifically asked plaintiff whether she had reported her injury in a timely manner.  Perhaps the decision was unfair.  Maybe plaintiff deserved leniency for violating a rule she didn't know about on one of her first days on the job.  And perhaps the employer's decision was incorrect.  Maybe plaintiff did report her injury at the end of the shift when it occurred.  But the court does "not ask whether the employer's reasons were wise, fair or correct;" it asks, instead, "whether the employer honestly believed its reasons and acted in good faith upon them." *Riggs*, 497 F.3d at 1118–19; *see also Forbes v. Kinder Morgan, Inc.*, 172 F. Supp. 3d 1182, 1198 (D. Kan. 2016) (finding that employer's decision to terminate plaintiff "perhaps was unwise[,]" "unfair[,]" "and incorrect[,]" but concluding that the summary judgment evidence didn't create a genuine factual issue of "whether [the employer] made a good faith, business-oriented decision").  Here, plaintiff hasn't identified evidence of a clear and convincing nature in the summary judgment record that creates a genuine issue of material fact whether Walmart terminated plaintiff based on its good faith belief that she had violated a workplace rule.  The court thus grants summary judgment to Walmart on plaintiff's sole claim for retaliatory discharge under Kansas law.

## IV.  Conclusion

For reasons explained by this Order, the court grants defendant Walmart's Motion for Summary Judgment (Doc. 94).  The court directs the Clerk to enter Judgment in defendant's favor against plaintiff's claim and close the case.

**IT IS THEREFORE ORDERED BY THE COURT THAT** defendant Walmart's Motion for Summary Judgment (Doc. 94) is granted.

**IT IS SO ORDERED.**

**Dated this 8th day of December, 2021, at Kansas City, Kansas.**

**s/ Daniel D. Crabtree**
**Daniel D. Crabtree**
**United States District Judge**